## DOUGLAS HOTEL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 14303.

United States Court of Appeals
Eighth Circuit.

July 25, 1951.

---

1. It is not disputed that if the plaintiffs have the right of inspection they also have the right of publication.

William J. Hotz, Omaha, Neb. (William J. Hotz, Jr., Omaha, Neb., was with him on the brief), for petitioner.

Edward J. P. Zimmerman, Sp. Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott, Fred E. Youngman, Sp. Assts. to the Atty. Gen., were on the brief), for respondent.

Before GARDNER, Chief Judge, and RIDDICK and COLLET, Circuit Judges.

COLLET, Circuit Judge.

The Tax Court found deficiencies in petitioner's excess profits taxes for the years 1942 and 1943. In doing so the court affirmed the Commissioner's orders to that effect. Separate appeals were taken from the orders relating to the deficiencies for each separate year. Those appeals have been consolidated. The controversy on this appeal arises out of a difference of opinion between the Tax Court and petitioner concerning the valuation of certain lands constituting a portion of petitioner's capital structure; whether certain funds withdrawn in cash from petitioner's assets constituted accumulated earnings and prof-

its or represented a portion of the invested capital; and whether or not petitioner was subject to payment of excess profits taxes for the years involved under the applicable provisions of the Internal Revenue Code and the regulations thereunder. As tersely stated by petitioner in its brief, the three questions assigned as error in the petition for review are (1) whether the Tax Court erred in the valuation of the real estate involved; (2) whether the Tax Court erred in holding that the withdrawals in cash above referred to constituted a portion of the equity invested capital; and (3) whether petitioner was exempt entirely from the payment of excess profits taxes. Those questions will become more understandable in the light of the facts.

In 1912 a project contemplating the erection of a first-class 16-story hotel building at 18th and Douglas Streets, in Omaha, Nebraska, was conceived. A substantial property owner, Arthur D. Brandeis, was one of the principal parties interested in the development. His interest was both civic and financial. He owned considerable real estate in that immediate vicinity and was financially concerned in holding a business center in the locality of the proposed new hotel. He acquired Lots 5 and 6 and the south half of Lots 7 and 8 in Block 109, at 18th and Douglas Streets, in November, 1912, from Edward Cudahy, for $125,000. In the same month he acquired the north half of Lots 7 and 8 from Frank T. Hamilton and others for $35,000. It appears that Mr. Hamilton and his associates sold upon the representation to them that Mr. Brandeis was making the purchase for the purpose of donating that and other land adjoining it to a corporation to be organized for the purpose of erecting a first-class modern hotel thereon. The Douglas Hotel Company was formally incorporated January 2, 1913, for the purpose of erecting the hotel building and leasing it to a responsible hotel operator. Mr. Brandeis was active in the incorporation of the company and made an agreement with it that of its total capital stock of 5,000 shares of cumulative preferred stock with a par value of $100 each and 5,000 shares of common stock with a par value of

$100 each, it would issue and sell for cash at least 4,000 shares of the preferred stock and would issue 2,000 shares of common stock and give one share of the common stock to each purchaser of two shares of preferred stock as an inducement to the sale of the 4,000 shares of preferred. It was further agreed between Mr. Brandeis and the company that he would convey to the company the site for the hotel, consisting of Lots 7 and 8, constituting an area in the southeast corner of Block 109 of 132 feet square, without charge to the company, if and when the company issued the stock as aforesaid, and made plans for the construction of the hotel building and the lease for its operation by a responsible and competent hotel operator, at an appropriate rental, for a period of twenty years. Other conditions entered into the transaction which are not presently important. This arrangement was carried out, and on March 11, 1913, Mr. Brandeis delivered to the company his deed dated January 6, 1913, to Lots 7 and 8. A satisfactory lease had theretofore been arranged with a competent hotel operator for a period of twenty years at a satisfactory annual rental of $70,200, the payments to begin upon the opening of the hotel. 4,000 shares of the preferred stock of the company had been subscribed at par, and the company had arranged for and issued to the subscribers 2,000 shares of common stock, all pursuant to the aforesaid arrangement and understanding. Considerable publicity was given to the enterprise in the newpapers and otherwise. The evidence contains a number of clippings from newspapers of that time in which responsible businessmen were quoted as fixing the value of the site "donated" by Mr. Brandeis at from $200,000 to $250,000. The company set up on its books the value of the site at $200,000—the value which it had placed upon the 2,000 shares of common stock which it contends were issued in consideration of the conveyance to it of the site. An architect was employed to superintend the construction of the building. He recommended that an additional 22 feet lying immediately west of Lots 7 and 8 and adjacent thereto be acquired for use in the construction of the project. This

22 feet constituted a part of Lot 6 heretofore referred to. Mr. Brandeis conveyed this 22 feet to the company in April, 1913, under the same arrangements as had theretofore been made concerning the transfer of Lots 7 and 8. He required that an additional 1,000 shares of preferred stock be sold at par, that an additional 500 shares of common stock be issued to the purchasers of the 1,000 shares of preferred, and that the company assume a $15,000 mortgage and a special improvement tax of $1,386.08 on the 22 feet. This was done, and all the land was carried on the company's books at the total figure of $262,661.08. That amount consists of $246,275, the value placed upon the land, plus the $15,000 mortgage assumed in the acquisition of the 22 feet, plus the special improvement tax of $1,386.08 paid by the company. After some adjustments and mathematical corrections were made, the actual amount of stock issued consisted of $494,550 of preferred and $246,275 of common. The stock ledger sheets show stock issued for cash of $494,550, and for real estate $246,275. No other stock was issued and sold, and this remained the capitalization up to and including the years of 1942 and 1943, with the exception that near the completion of the building additional capital was obtained by a first mortgage of $400,000 and a second mortgage of $44,000. Thus the capital structure of the company consisted of approximately $1,200,000. That capitalization has been maintained on the company's books up to and including the time now involved. The building and its fixtures and equipment actually cost $929,841.

The company set up a depreciation reserve account and paid into that account each year out of the rental income an appropriate sum representing depreciation on the property. After the payment of operating expenses of the company, it paid dividends regularly each year on the stock. A considerable sum was accumulated in this depreciation reserve account in cash when in 1924 all of the stock was sold to Mr. Rome Miller for $1,100,000. Mr. Miller took over the management of the company in January, 1924, and withdrew all of the cash having theretofore accumulated in the depreciation reserve account, as well as all of the balance of the income arising from the rentals after the payment of expenses. He continued that practice thereafter.

In a proceeding before the Tax Court in 1939, entitled Douglas Hotel Company v. Commissioner, Docket 83,750, 94,251, 39 B.T.A. 1243 (Memorandum Opinion), the question arose as to whether this company should not have been charged with constructively having received interest on the depreciation reserve account now involved—on the theory that the withdrawal of the depreciation reserve account was a loan by the company to Mr. Miller. In that proceeding the company (petitioner here) contended that the withdrawal of the depreciation reserve constituted a withdrawal of the capital assets. The Tax Court held in that proceeding that the depreciation reserve account was withdrawn without any intention of returning it and did not constitute a loan to Mr. Miller. The Tax Court did not find it necessary nor deem it appropriate to determine whether these withdrawals were of capital or of corporate earnings.

When the company submitted its tax returns for the years 1942 and 1943, it treated as its assets the building and equipment, and the land, the latter valued at $262,661.08. The Commissioner assessed a deficiency resulting from his valuation of the real estate at $125,000 instead of $262,661.08, and because he deducted from equity invested capital all of the depreciation reserve withdrawn by Mr. Miller, amounting to $448,438.67. With these deductions from capital, the excess profits taxes were correspondingly larger, and a deficiency was determined for 1942 in the amount of $4,895.44 and for 1943, $11,777.33. In 1942, in the company's excess profits tax return, it showed its invested capital as reduced by the amount of the Miller withdrawals from the depreciation reserve account, to-wit: $448,438.67. In the present action the company contends that this was an error and that the item should be treated as accumulated earnings and profits. The present proceeding is for the recovery by the com-

pany, as petitioner, of the foregoing amounts of $4,895.44 and $11,777.33.

When these proceedings were instituted, the Commissioner in his original answer did not allege that the conveyance of the real estate by Mr. Brandeis to petitioner was a gift, and included it in the capital structure at $125,000, his valuation thereof. Before the hearing of the cause by the Tax Court, the Commissioner amended his answer and alleged that the real estate was donated to petitioner and therefore the value of the land should not be included in the capital structure for the purpose of calculating the excess profits tax. That was before the decision of the Supreme Court in Brown Shoe Company, Inc., v. Commissioner, 1950, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081. The Brown Shoe Company case was decided after this case was submitted to the Tax Court but before it was decided. The Tax Court found that the real estate was donated, but since under the Brown Shoe Company case the value of the real estate may properly be treated as capital, although it may have been a gift, the Tax Court treated it as capital, and upon extensive testimony as to its value, fixed its fair market value as of the date the title was transferred to petitioner in 1913 at $125,000.

Much of petitioner's brief is devoted to the contention that the Tax Court erred in finding that the land was a donation. Petitioner argues that as it was not a donation it should have been valued in the manner provided by Section 718(a) (1, 2) of the Internal Revenue Code, 26 U.S.C. 718, 1946 Ed.[1]; Section 113 (a) of the Internal Revenue Code, 26 U.S.C. 113, 1946 Ed.[2]; and Treasury Regulations 112, Section 35.718-1[3], at its cost to petitioner. That its cost to petitioner was the value of the stock it issued therefor, plus the $15,000 mortgage and the $1,386.08 tax. That the value of $246,275 placed by the petitioner upon its stock should have been accepted by the Tax Court with the result that the fair market value of the real estate should have been fixed by the Tax Court at that

1. "§ 718. Equity invested capital

"(a) Definition. The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

"(1) Money paid in. Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

"(2) Property paid in. Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * * "

2. "§ 113. Adjusted basis for determining gain or loss—

"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; * * *."

3. Treasury Regulations 112, promulgated under the Internal Revenue Code as amended (for taxable years beginning after December 31, 1941):

Sec. 35.718-1 Determination of Daily Equity Invested Capital—Money and Property Paid in.—The equity invested capital for any day is determined as of the beginning of such day. The basis for starting point is found in the amount of money and property previously paid in for stock, or as paid-in surplus, or as a contribution to capital. The terms "money paid in" and "property paid in" do not include amounts received as premiums by an insurance company subject to taxation under section 204. For the purpose of determining equity invested capital, the amount of any property paid in is the unadjusted basis to the taxpayer for determining loss upon a sale or exchange under the law applicable to the taxable year for which the invested capital is being computed. * * *

* * * * * *

If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance. If the stock had no established market value at the time of the exchange, the fair market value of the assets of the company at that time should be determined and the liabilities deducted. The resulting net worth will be deemed to represent the total value of the outstanding stock. In determining net worth for the purpose of fixing the fair market value of the stock at the time of the exchange, the property paid in for such stock shall be included in the assets at its fair market value at that time.

amount plus the $15,000 mortgage and the $1,386.08 tax, or a total of $262,661.08.

The fallacy of that conclusion lies in the fact that petitioner concedes that neither the Commissioner of Internal Revenue nor the Tax Court was bound to accept petitioner's valuation of its stock. On the contrary, by the second paragraph of the quoted portion of Regulations 112, when the stock had no established market value at the time of its exchange for the real estate, the value of the stock is to be ascertained by determining the fair market value of the corporate assets. The only assets petitioner possessed on March 11, 1913, when under its theory the stock was transferred for the real estate, were the cash on hand from the sale of the preferred stock and the real estate in question. This avenue of approach to values therefore leads to a determination of the fair market value of the real estate as a measure of the value of the stock. The existence of the lease which furnished a prospect of a rental from the land and the building to be erected on it of $70,200 a year for twenty years is said to require a valuation of the land substantially equal to the asserted value of $246,275 which petitioner places on the common stock issued. This latter contention will be considered in connection with the consideration of the propriety of the Tax Court's finding of the value of the real estate.

Since it was necessary under the foregoing quoted provisions of Regulations 112 to determine the fair market value of the real estate for the purpose of arriving at the fair market value of the stock, it was incumbent upon the Tax Court to determine the fair market value of the real estate, as such, if it pursued either the route suggested by petitioner, or the route

charted by Section (a)(4) of Section 113 (which the Tax Court did follow), for the determination of the value of property acquired by gift.[4] Hence we lay aside the controversy as to whether the transfer was in consideration of and for the issuance of the common stock, or was a donation.[5]

But petitioner contends that in determining the fair market value of the real estate the Tax Court erred in not finding that its value was that fixed by three qualified real estate appraisers, witnesses before the Tax Court, and the value assigned to the real estate in the newspaper articles at the time of the transfer in 1913. Those witnesses fixed the value of the real estate at approximately the same value which petitioner placed upon its common stock. In its opinion the Tax Court said:

"We think that the best evidence before us as to the value of the property either in January or March 1913 is the price which Brandeis paid for it in an arm's length transaction in November 1912. He paid $160,000 for the whole southern half of block 109, including lots 5 and 6 comprising the southwest corner of the block and lots 7 and 8 comprising the southeast corner. The real estate agent who handled the transaction testified in this proceeding that the price of $160,000 represented the fair market value of the land at that time and that there was no appreciable change in its value up to the time petitioner acquired it, aside from its usage in connection with the proposed hotel. In the absence of any evidence to the contrary, we may assume that lots 7 and 8 had about the same value as lots 5 and 6.

\* \* \* \* \* \*

"We think, and have so found above, that the value of the property at the time of its acquisition by petitioner was not in

4. "§ 113. Adjusted basis for determining gain or loss—
"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—
\* \* \* \* \* \*
"(4) Gift or transfer in trust before January 1, 1921. If the property was acquired by gift or transfer in trust on or before December 31, 1920, the basis

shall be the fair market value of such property at the time of such acquisition." 26 U.S.C. 1946 Ed., Sec. 113.

5. The Tax Court said: "The petitioner and the respondent seem to be in agreement that the property in question is to be included in petitioner's invested capital, if at all, at its fair market value when acquired by the petitioner."

excess of $125,000, the amount at which the respondent included it in petitioner's invested capital in his notice of deficiency."

██ Petitioner argues that the price at which Mr. Brandeis acquired the property in November, 1912, was not the best evidence. But in so doing the fact is overlooked that this court does not pass upon the weight of the evidence before the Tax Court. The date of the sale of the land to Mr. Brandeis was not too remote for the evidence of the terms of that sale to be properly considered as evidence of the value of the property. Evidence of what property sold for within a reasonable time before the material date upon which its fair value is to be determined is universally considered competent, substantial, and persuasive evidence of its fair value on the material date. It is, of course, not the only evidence which may be considered on the subject. But by the same token, neither is the evidence of the witnesses as to their opinion of its fair market value on the material date the only evidence that may or should be considered.

██ Nor is the fair market value of real estate to be conclusively fixed by capitalizing its prospective earnings from business and commercial uses. All uses to which real estate may reasonably be put may be considered in determining the fair market value. The existence of the lease for the hotel, when constructed, justified the consideration of this property as an appropriate site for a hotel in determining its value. And petitioner's evidence, as well as the Commissioner's, indicates that it was sold by Cudahy and Hamilton in November, 1912, for that prospective use. The rental income from long-term leases on real estate is, under proper circumstances, persuasive evidence of fair market value. And the prospective income from the lease of the hotel yet to be constructed on March 11, 1913, although subject, as it necessarily was, to the uncertainties and contingencies always incident to projects such as this, was, under the facts of this case, proper evidence bearing upon the fair market value of the real estate which was ultimately to constitute a portion of the completed property on which the rent was to be paid. But no authorities are cited and we know of none which support petitioner's theory that the triers of the fact should be required to accept petitioner's estimate of the proportionate value the real estate would have of the value of the entire property when completed, and then to further accept as the fair market value of the real estate a figure representing the capitalization, on a percentage basis, of that portion of the total expected income hypothetically allocated by petitioner or its witnesses as the annual rental from the real estate alone.

The argument which petitioner's counsel forcefully and ably makes in this court concerning which evidence of fair market value should be given the greater weight was no doubt made to the Tax Court and is one which was more appropriately addressed to that court. We are only called upon to say whether there was substantial evidence to support the finding of the Tax Court. Being supported by substantial evidence, we are not at liberty to set aside the finding of the Tax Court of the fair market value of the real estate.

Petitioner further contends that the Tax Court erroneously treated January 6, 1913, the date of the deed from Brandeis to petitioner, as the date of the transfer of title in determining the material date upon which the fair market value should be determined, and that if the Tax Court had treated March 11, 1913, the date of the transfer of the deed to petitioner, as the material date, its finding of fair value would have necessarily been different. From that premise it is argued the Tax Court erred in its legal determination of the material date. We do not construe the findings and opinion of the Tax Court as holding that it fixed the fair value as of January 6, 1913. That court said: "Petitioner contends that the date of acquisition was March 11, 1913, when the deed was delivered to it and recorded, while respondent claims that it was about January 6, 1913, the date the deed was executed. We do not deem it necessary here to decide that question. The evidence is that the value of the property was about the same in

March that it was in January and that there was no increase in value over that period, except as may have resulted from petitioner's intended use of it."

It appears to be reasonably apparent that the Tax Court was of the opinion that the difference in time between January 6 and March 11 made no material difference in the fair value of the real estate. That conclusion is fortified to some extent by one of the witnesses who stated that there would be little change in value "in a month", referring to a month during the interim between November and March, and is further supported by the evidence referred to in the above quoted excerpt from the Tax Court's opinion.

The propriety of the Tax Court's action in deducting from invested capital the accumulated depreciation reserve fund which Mr. Miller withdrew involves a consideration of the nature of that fund and its relation to the capital structure of the corporation. This deduction was based upon Sections 718 (b)(1) and (2) of the Internal Revenue Code[6], and Section 29.115–6 of Regulations 111[7].

We find the quotation furnished by petitioner from Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, loc. cit. 101, 63 S.Ct. 902, 903, 87 L.Ed. 1286, pertinent and instructive, wherein the Supreme Court said: "It will be seen that the rule applicable to most business property of a cost basis properly adjusted leaves many problems of depreciation accounting to be answered by sound and fair tax administration. The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein. Or as a layman might put it, the machine in its lifetime must pay for itself before it can be said to pay anything to its owner. Experience and judgment hit upon usable mortality tables for classes of property from which annual rates of accrual are estimated and several different methods are employed for relating this physical deterioration and functional obsolesence to financial statements. The calculation is influenced by too many variables to be standardized for differing enterprises, assets, conditions, or methods of business. The Congress wisely refrained from formalizing its methods and we prescribe no over-all rules."

We may with propriety amplify what is said in the foregoing quoted portion of the Supreme Court's opinion with an illustration frequently used in explaining the purpose of establishing and accumulating depreciation reserve funds. That illustration is to visualize a common pencil as the equipment to be depreciated. At the beginning of its use it is full length, representing the full life of the physical asset when new. With its continued use,

---

6. "(b) Reduction in equity invested capital. The amount by which the equity invested capital for any day shall be reduced as provided in subsection (a) shall be the sum of the following amounts—
"(1) Distributions in previous years. Distributions made prior to such taxable year which were not out of accumulated earnings and profits;
"(2) Distributions during the year. Distributions previously made during such taxable year which are not out of the earnings and profits of such taxable year; * * *." 26 U.S.C. 1946 Ed., Sec. 718.

7. Sec. 29.115–6. Distributions From Depletion Or Depreciation Reserves. A reserve set up out of gross income by a corporation and maintained for the purpose of making good any loss of capital assets on account of depletion or depreciation is not a part of surplus out of which ordinary dividends may be paid. A distribution made from a depletion or a depreciation reserve based upon the cost or other basis of the property will not be considered as having been paid out of earnings or profits, but the amount thereof shall be applied against and reduce the cost or other basis of the stock upon which declared. If such a distribution is in excess of the basis, the excess shall be taxed as a gain from the sale or other disposition of property as provided in section 29.1111. * * *

although accompanied by proper maintenance, it gradually shrinks in length, just as the useful life expectancy of machinery or a building decreases with the passage of time. Eventually the pencil has shrunk to the point where its decreased length renders it no longer useful. But throughout its useful life up to the point when it becomes useless, it is as usable as it was at the beginning of its useful life. That is substantially true of a building. In order to create a fund to represent the expended portion of the physical asset or with which to replace it, the practice of establishing a depreciation reserve fund arose. Theoretically that depreciation reserve fund should be replenished at regular intervals exactly in proportion to the diminishing useful life of the property. And theoretically the amount of that fund should always exactly equal the expended useful life of the property. The ascertainment of the amount of cash from gross income which must be placed in the depreciation reserve fund at regular intervals in order to maintain proper balance between the fund and depreciation is ordinarily from necessity based upon past experiences with the life of like or similar property. That method of determining depreciation is customarily referred to as the "straight line" method. It derives its name from the fact that based upon past experience, the assumption is indulged that the property will depreciate at an assumed average fixed rate, based upon its estimated total life. In that manner a building of a certain type which past experience has indicated will have a useful life of fifty years is assigned a straight-line depreciation rate of two per cent each year. But the rate of actual depreciation may not be constant. Anticipated conditions may fail to occur, accelerating or slowing down the depreciation. For that reason, oftentimes a fixed straight-line rate of depreciation may result in an over-accumulation or a deficit in the depreciation reserve fund. When an over-accumulation occurs and an adjustment of the fund is made by distribution of the excess, the distribution may under proper circumstances be characterized as a belated distribution of earnings which were unnecessarily set aside for depreciation reserve, or under appropriate circumstances treated as a sale or disposition of the property for which it stands. Naturally, because of the underlying purpose of the depreciation reserve fund, the fund stands in the place of and represents the expended usefulness of the property. It follows that when the fund is withdrawn, that amount of the original invested capital is withdrawn from the corporate assets of the owner of the property. That furnishes the underlying rationale for the practice of decreasing the value of the stock of a corporation for tax or other purposes when a portion of the invested capital, either in the form of physical equipment or depreciation reserve funds representing expended depreciable equipment, is withdrawn. As the Supreme Court said in the Edison case, "The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." And "It will be seen that the rule applicable to most business property of a cost basis properly adjusted leaves many problems of depreciation accounting to be answered by sound and fair tax administration." In this case the Tax Court, we think, applied the foregoing rule of sound and fair tax administration. It seems perfectly obvious that when the depreciation reserve fund was withdrawn by Mr. Miller, that withdrawal was not of accumulated earnings and profits but was, for all practical purposes, a withdrawal of that much of petitioner's capital assets. The rate of depreciation fixed by petitioner is not challenged. The fact that the original cost of the building and equipment was $929,841, and approximately 27 years of its useful life had expired, supports the propriety of the depreciation rate applied.

Petitioner claims that personal income of Mr. Miller other than income from the hotel property was deposited with the depreciation reserve funds, was commingled with that fund, and constitutes a portion of the $448,438.67 deducted from capital assets as depreciation reserve funds. Although there is evidence that some of

Mr. Miller's personal funds were deposited in the same account with the petitioner's rental income, we are referred to no evidence that these personal funds constituted a part of the $448,438.67.

Petitioner contends that Section 718 (b) (1) and (b)(2), heretofore quoted in footnote 6, should be applied only for the purpose of making deductions in the cost basis of stock for purposes other than the ascertainment of excess profits taxes. We do not so construe these statutory provisions. Both Sections 718 (b)(1) and 718 (b)(2) clearly provide that the equity invested capital shall be reduced by distributions of the corporation "which were not out of accumulated earnings and profits." Section 29.115–6 of Regulations 111, dealing particularly with distributions from depletion or depreciation reserves, heretofore quoted in footnote 7, fortifies that conclusion.

We find no error in the Tax Court's finding that the distribution to Mr. Miller of the depreciation reserve fund was not from accumulated earnings and profits, and in reducing petitioner's invested capital by the amount of such withdrawals.

Petitioner's contention that it is exempt from the payment of excess profits taxes is without merit. Its theory is that it is exempt under Section 727 (g)(2) of the Internal Revenue Code because none of its income was derived from the active conduct of a trade or business. Petitioner reads Section 727 (g)(2) entirely independent of and disassociated from Section 727 (g)(1) and contends that Section 727 (g) (2) exempts domestic corporations when not more than 50 per cent of its gross income was derived from the active conduct of a trade or business. But subparagraphs (1) and (2) of Section (g) must be read together, and as so read they clearly contradict petitioner's construction. The two sections of subsection (g) are as follows:

"(g) Domestic corporations satisfying the following conditions: [are exempt]

"(1) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

"(2) If 50 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business." 26 U.S.C. 1946 Ed., Sec. 727.

The conditions of both (1) and (2) of Section (g) being essential to exemption and petitioner not meeting the first, the Tax Court correctly denied its claim to exemption.

The judgment of the Tax Court should be and is affirmed.