T.C. Memo. 2005-2

UNITED STATES TAX COURT

ESTATE OF HELEN M. NOBLE, DECEASED, LESLIE H. NOBLE, JR., AND
JOHN R. NOBLE, CO-PERSONAL REPRESENTATIVES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12606-01.              Filed January 6, 2005.

Daniel J. Duffy, for petitioners.

J. Anthony Hoefer, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioners petitioned the Court to
redetermine respondent's determination of a $223,207 deficiency
in the Federal estate tax of the Estate of Helen M. Noble (the
estate) and a $50,221.57 addition to tax under section
6651(a)(1).  Following concessions, we must decide the

September 2, 1996, fair market value of the 11.6-percent interest in Glenwood State Bank (Glenwood Bank) that Helen N. Noble (decedent) owned. The estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (estate tax return), reported the fair market value as $903,988. Respondent determined in the notice of deficiency that the fair market value was $1.1 million. Petitioners currently argue that the fair market value was $841,000 or less. Respondent argues that the fair market value was $1.1 million, as determined.

We hold that the fair market value of the interest was $1,067,000. Unless otherwise noted, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The parties filed with the Court a stipulation of 14 facts and 2 accompanying exhibits; namely, the estate tax return and the notice of deficiency. We have found the stipulated facts accordingly and have found other facts from the two exhibits. Decedent died on September 2, 1996, while residing in Gage County, Nebraska. John R. Noble and Leslie H. Noble, Jr., the co-personal representatives of the estate, resided in Lincoln, Nebraska, when the petition was filed in this Court.

The estate filed the estate tax return on July 23, 1998. Estate tax return reported that decedent's gross estate included

116 shares of stock in Glenwood Bank. Those shares were part of 1,000 nonpublicly traded shares of the only class of stock that Glenwood Bank had outstanding at the time of decedent's death and represented an 11.6-percent interest in Glenwood Bank. The estate tax return reported that the fair market value of each of the 116 shares equaled its 1996 book value ($14,169) less a 45-percent minority interest discount, resulting in a reported total fair market value of $903,988.

When decedent died, Glenwood Bancorporation (Bancorporation) owned the remaining 88.4-percent interest in Glenwood Bank. The shareholders of Bancorporation were John Dean (Dean), Dean's son, and Dean's son-in-law. Dean owned 69 percent of Bancorporation's stock, and he was unrelated familially to decedent.

Bancorporation purchased two blocks of Glenwood Bank stock during the 15-month period ending on the date of decedent's death. First, in June 1995, Bancorporation purchased 10 shares of Glenwood Bank stock at $1,000 per share. Second, in July 1996, Bancorporation purchased 7 shares of Glenwood Bank stock at $1,500 per share.

After decedent died, Dean sought to buy the 116 Glenwood Bank shares held by the estate. On May 15, 1997, Dean obtained from the accounting firm of Seim, Johnson, Sestak & Quist, LLP (Seim Johnson), a written appraisal (appraisal) of the fair market value of those shares as of December 31, 1996. Seim

Johnson issued the appraisal to Dean solely to assist the management of Glenwood Bank in making a cash purchase of the shares. The appraisal was prepared on behalf of Seim Johnson by Dennis R. Hein (Hein) and concluded that the fair market value of the 116 Glenwood Bank shares held by the estate was $878,004 ($7,569 per share) as of December 31, 1996. The appraisal stated that this fair market value included a 29-percent discount for minority interest and a 35-percent discount for lack of marketability. The estate declined to sell its Glenwood Bank shares to Dean at this appraised price. The estate sold those shares to Bancorporation on October 24, 1997, for $1.1 million ($9,483 per share).

On July 18, 2001, respondent issued to the estate a notice of deficiency in which he determined, among other things, that the fair market value of decedent's 116 Glenwood Bank shares was $1.1 million. The notice states that "The value of the decedent's stock was adjusted to the fair market value as determined by Shenehon Company."

At trial, respondent called William C. Herber (Herber) as an expert witness, and the Court over the objection of petitioners recognized him as an expert on the valuation of financial institutions. The Court also over the objection of petitioners accepted into evidence Herber's expert report under Rule 143(f) (Shenehon report), written on behalf of his employer, Shenehon

Co., stating that the applicable fair market value of an 11.6-percent ownership interest in Glenwood Bank was $1.1 million. The Shenehon report was a second expert report prepared by Herber on behalf of Shenehon Co. as to the fair market value of the 11.6-percent interest. Shenehon Co.'s first report indicated on its face that it had been prepared by three individuals, but only one of those individuals was available to testify at trial. We excluded the first report from evidence on the basis of our Opinion in Bank One Corp. v. Commissioner, 120 T.C. 174 (2003). There, we excluded from evidence the rebuttal report of the taxpayer's expert that was alleged by the Commissioner to be tainted in its preparation by the significant participation of the taxpayer's counsel. Id. at 278. We held that the rebuttal report was inadmissible because the expert had not established that the words, analysis, and opinions in that rebuttal report were his own work. Id. (citing Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 592 n.10 (1993)). As is equally true here, we were not persuaded by a preponderance of proof that the words, analysis, and opinions in the excluded report were the work of Herber.

The Shenehon report ascertained the fair market value of the subject shares by considering four valuation methods (book value method, discounted cashflow method, public guideline market method, and private guideline market method) and applying a

15-percent minority interest discount and a 30-percent lack of marketability discount to the values derived under those methods. The book value method reflected Glenwood Bank's reported equity as of June 30, 1996, the most current data available as of decedent's date of death. The discounted cashflow method applied a 14.5-percent discount rate to Glenwood Bank's projected annual income for each of the years during a 10-year period ending in December 2005 and an 11.5-percent rate to the bank's residual value. The public guideline market method reflected prices paid for companies which were engaged in a business similar to Glenwood Bank's and whose stock was actively traded in a public market. The private guideline market method reflected transactions involving acquisitions of privately held banks comparable to Glenwood Bank. The resulting values derived under these four methods were as follows:

|  | Book Value | Discounted Cash Flow | Public Guideline Market | Private Guideline Market |
|---|---|---|---|---|
| Value before discounts | $14,135,000 | $11,100,000 | $14,000,000 | $18,200,000 |
| 15-percent minority interest discount | 2,120,250 | n/a | n/a | 2,730,000 |
| Marketable minority interest value | 12,014,750 | 11,100,000 | 14,000,000 | 15,470,000 |
| 30-percent lack of marketability discount | 3,604,425 | 3,330,000 | 4,200,000 | 4,641,000 |
| Nonmarketable minority interest value | 8,410,325 | 7,770,000 | 9,800,000 | 10,829,000 |
| Subject percentage interest | 11.6 | 11.6 | 11.6 | 11.6 |
| Resulting value of subject interest | 975,598 | 901,320 | 1,136,800 | 1,256,164 |

The average of the resulting values is $1,067,470.50 ((975,598 + 901,320 + 1,136,800 + 1,256,164)/4).

At trial, petitioners called three experts to testify in support of petitioners' challenge to respondent's determination of the fair market value of decedent's shares. Each of these

experts, namely, Hein, Janet M. Labenz (Labenz), and Z. Christopher Mercer (Mercer), also prepared an expert report under Rule 143(f). Hein's expert report (Seim Johnson report) was merely the appraisal with a February 8, 2003, cover letter stating in relevant part that "Our opinion is the same opinion as it was as of December 31, 1996". The cover letter also stated that Seim Johnson had been

> engaged with the management of the [Glenwood] Bank to value the [estate's 116 Glenwood Bank] shares as of December 31, 1996. * * * We have inquired as to significant items for the last quarter of 1996 that would have a material effect on the valuation of the stock from the time of Mrs. Noble's death and the date of our original valuation. We were informed that there are no such items which would have materially affected the valuation from the time of death to the valuation date.

Labenz's expert report (Labenz report) was accepted into evidence as a rebuttal to the opinion of respondent's expert. The Labenz report addressed the differences between the Shenehon report and the Seim Johnson report.

The Court with no objection from respondent recognized Mercer as an expert on the valuation of financial institutions and with no objection from respondent accepted Mercer's expert report (Mercer report) into evidence. The Mercer report concluded that the fair market value of the estate's 11.6-percent interest in Glenwood Bank was $841,000. The Mercer report generally arrived at this fair market value through a two-step process. First, the Mercer report ascertained the marketable

minority value for Glenwood Bank by considering five methods (a transaction value method, a net asset value method, a discounted future earnings method using a 10-percent earnings growth and a 20-percent earnings growth, and two guideline company methods, one using a regional peer group, the other a high-equity assets group, and both using capitalized earnings and capitalized book value). The transaction method recognized the two sales of Glenwood Bank stock happening before the valuation date and reflected the $1,500-per-share price paid in the more recent second sale. The net asset value method reflected Glenwood Bank's reported equity as of June 30, 1996, as adjusted to take into account an unrealized $128,000 gain in bond portfolio and a 38-percent related tax adjustment ($48,640). The discounted future earnings method reflected earnings growth rates of 10 percent and 20 percent and a present value rate of 14.1 percent. The guideline company methods reflected a regional group of 11 financial institutions similar to Glenwood Bank and a nationwide group of 19 banks that reported total assets of less than $1 billion and an asset/equity ratio of greater than 12 percent. The resulting values derived under these five methods were as follows:

| Method | Resulting Value |
|---|---|
| Transaction value | $1,500,000 |
| Net asset value | 14,124,000 |
| Discounted future earnings: | |
|   10-percent earnings growth | 11,364,000 |
|   20-percent earnings growth | 14,224,000 |
| Guideline company regional peer group: | |
|   Capitalized earnings | 8,306,000 |
|   Capitalized book value | 17,174,000 |
| Guideline company high/equity assets group: | |
|   Capitalized earnings | 8,543,000 |
|   Capitalized book value | 16,860,000 |

The Mercer report gave no weight to the transaction value method, the net asset value method, or the discounted future earnings method, and ascertained the value of the marketable minority interest to be $12,721,000 by averaging the other four amounts (8,306,000 + 17,174,000 + 8,543,000 + 16,860,000)/4 = 12,720,750) and rounding the resulting average to the nearest thousand. The Mercer report as a second step in the valuation process then ascertained the applicable fair market value of decedent's 11.6-percent interest by applying a 43-percent lack of marketability discount to the marketable minority interest value of $12,721,000 (12,721,000 x 43% = 5,470,030) and multiplying the resulting rounded number of $7,251,000 (12,721,000 - 5,470,030 = 7,250,970) by 11.6 percent. The Mercer report derived the 43-percent lack of marketability discount by applying a quantitative marketability discount model (QMDM) adopted and advocated by Mercer. The Mercer report noted that the estate had

sold its 116 Glenwood Bank shares after decedent died and that
relative to certain assumptions in the QMDM analysis as of
September 2, 1996, the selling price for those 116 shares should
have been approximately $1.9 million, rather than the $1.1
million actually received.  The Mercer report "ignored" this
postdeath sale because hypothetical investors would not have
known about it when decedent died.

OPINION

I.  Preliminary Statement

Neither party called a fact witness to testify at trial.
(Each expert who testified at trial testified solely as an expert
and not as both a fact witness and an expert witness.)  Nor did
either party introduce at trial any exhibit other than the expert
reports, the two stipulated exhibits, and a statement listing one
of the expert's qualifications.  Most of the facts which we find
in this case come from the stipulation of facts and the two
accompanying exhibits.  While the parties invite the Court to
find additional facts solely from data relied upon by the experts
in forming their expert opinions, we decline to do so.  As the
Court has stated previously in a similar setting:

> Much of the purported data that * * * [the expert]
> relied upon in reaching his conclusion also never made
> its way into evidence.  Although an expert need not
> rely upon admissible evidence in forming his or her
> opinion, Fed. R. Evid. 703, we must rely upon admitted
> evidence in forming our opinion and, in so doing, may
> not necessarily agree with an expert whose opinion is
> not supported by a sufficient factual record.  The mere

fact that the Court admits an expert's opinion into evidence does not mean that the underlying facts upon which the expert relied are also admitted into evidence. Anchor Co. v. Commissioner, 42 F.2d 99 (4th Cir. 1930); Rogers v. Commissioner, 31 B.T.A. 994, 1006 (1935); see United States v. Scheffer, 523 U.S. 303, 317 n.13 (1998) (whereas expert opinion is considered evidence, the facts upon which such an expert relies in forming that opinion are not considered evidence until introduced at trial by a fact witness); see also United States v. 0.59 Acres of Land, 109 F.3d 1493, 1496 (9th Cir. 1997). In a case such as this, where an expert witness relies upon facts which are critical to the Court's analysis of an issue, we expect that the party calling the witness will enter into evidence those critical facts. * * * [Haffner's Serv. Stations, Inc. v. Commissioner, T.C. Memo. 2002-38, affd. 326 F.3d 1 (1st Cir. 2003).]

## II. Rules on Valuation

The value of property for Federal estate tax purposes is a factual inquiry in which the trier of fact must weigh all relevant evidence and draw appropriate inferences to arrive at the property's fair market value. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Natl. Grocery Co., 304 U.S. 282, 294 (1938); sec. 20.2031-1(b), Estate Tax Regs. For this purpose, fair market value is the price that a hypothetical willing buyer would pay a hypothetical willing seller, both persons having reasonable knowledge of all relevant facts and neither person under a compulsion to buy or to sell. Sec. 20.2031-1(b), Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551-552 (1973); Estate of Fitts v. Commissioner, 237 F.2d 729, 731 (8th Cir. 1956), affg. T.C. Memo. 1955-269; Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331,

affd. without published opinion 116 F.3d 1476 (5th Cir. 1997). The particular characteristics of these hypothetical persons are not necessarily the same as those of any specific individual or entity and are not necessarily the same as those of the actual buyer or the actual seller. Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Bank One Corp. v. Commissioner, 120 T.C. at 305. Nor are these hypothetical persons considered to be compelled to buy or to sell the property in question. These hypothetical persons are considered to know all relevant facts involving the property. Bank One Corp. v. Commissioner, supra at 304-306. Each of these hypothetical persons also is presumed to be aiming to achieve the maximum economic advantage (i.e., maximum profit) from the hypothetical sale of the property. Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Curry v. United States, supra at 1428; Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Okerlund v. United States, 53 Fed. Cl. 341, 345 (2002), affd. 365 F.3d 1044 (Fed. Cir. 2004).

Special rules apply when valuing the stock of a closely held corporation. See Estate of Scanlan v. Commissioner, supra. While listed market prices of publicly traded stock are usually

representative of the fair market value of that stock for Federal tax purposes, the fair market value of nonpublicly traded stock is "best ascertained" through arm's-length sales near the valuation date of reasonable amounts of that stock, as long as both the buyer and the seller were willing and informed and the sales did not include a compulsion to buy or to sell.  Polack v. Commissioner, 366 F.3d 608, 611 (8th Cir. 2004), affg. T.C. Memo. 2002-145; accord Estate of Fitts v. Commissioner, supra at 731 (such arm's-length sales are the "best criterion of market value"); Estate of Hall v. Commissioner, 92 T.C. 312, 336 (1989) (same); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982) (same); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979) (same); Palmer v. Commissioner, 62 T.C. 684, 696-698 (1974) ("Ordinarily, the price at which the same or similar property has changed hands is persuasive evidence of fair market value.  * * *  Where the parties to the sale have dealt with each other at arm's length and the sale is within a reasonably close period of time to the valuation date, the price agreed upon is considered to have accurately reflected conditions in the market."), affd. 523 F.2d 1308 (8th Cir. 1975).  When nonpublicly traded stock cannot be valued from such arm's-length sales, its value is then best determined by analyzing the value of publicly traded stock in comparable corporations engaged in the same or a similar line of business, as well as by taking into account all

other relevant factors bearing on value that would be considered by an informed buyer and an informed seller.  Polack v. Commissioner, supra at 611; Estate of Fitts v. Commissioner, supra at 731-732; Estate of Hall v. Commissioner, supra at 336. In this regard, section 20.2031-2(f), Estate Tax Regs., states that

> If * * * actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration:
>
>        *      *      *      *      *      *      *
>
>     (2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors.
>
> Some of the "other relevant factors" * * * are:  the goodwill of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange.  However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case.  In addition to the relevant factors described above, consideration shall also be given to nonoperating assets, including proceeds of life insurance policies payable to or for the benefit of the company, to the extent such nonoperating assets have not been taken into account in the determination of net worth, prospective earning power and dividend-earning capacity.  Complete financial and other data upon which the valuation is based should be submitted with the return, including copies of reports of any examinations of the company made by accountants, engineers, or any technical experts as of or near the applicable valuation date.

The Commissioner has also set forth in a longstanding ruling, Rev. Rul. 59-60, 1959-1 C.B. 237, certain criteria to consider in determining fair market value. That ruling, which is widely accepted in the valuation community and which is regularly referenced by the judiciary and the Commissioner alike, Polack v. Commissioner, supra at 611, states that the

> Valuation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required date of appraisal. As a generalization, the prices of stocks which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented. When a stock is closely held, is traded infrequently, or is traded in an erratic market, some other measure of value must be used. In many instances, the next best measure may be found in the prices at which the stocks of companies engaged in the same or a similar line of business are selling in a free and open market. [Rev. Proc. 59-60, sec. 3.03, 1959-1 C.B. at 238.]

The ruling then states that in the absence of relevant market quotations, all available financial data and all relevant factors affecting fair market value must be considered in valuing the stock of a closely held corporation. Id. sec. 4.01. The ruling lists as relevant eight specific factors. These factors, which are virtually identical to the factors referenced in section 20.2031-2(f), Estate Tax Regs., are:

> (a) The nature of the business and the history of the enterprise from its inception.

> (b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of the stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter. [Rev. Proc. 59-60, sec. 4.01.]

III. Approaches to Valuation

In the case of nonpublicly traded stock the value of which cannot be determined by relevant arm's-length sales, fair market value is generally determined by using three approaches. The first approach is the market approach. The second approach is the income approach. The third approach is the asset-based approach. Each of these three approaches includes various valuation methods. The approach to apply in a given case is a question of law. Powers v. Commissioner, 312 U.S. 259, 260 (1941); Bank One Corp. v. Commissioner, 120 T.C. at 306. Litigants in this Court are usually assisted by experts in applying these approaches.

### 1. Market Approach

The market approach values a company's nonpublicly traded stock by using one or more methods to compare that stock to the same or comparable stock that has sold in arm's-length transactions in the same timeframe. The nonpublicly traded stock subject to valuation is valued by adjusting the sales price of the same or comparable stock to reflect any differences between that stock and the nonpublicly traded stock.

### 2. Income Approach

The income approach values a company's nonpublicly traded stock by using one or more methods that convert anticipated economic benefits into a single present amount. Valuation methods under this approach may directly capitalize earnings estimates or may forecast future benefits (earnings or cashflow) and discount those future benefits to the present.

### 3. Asset-Based Approach

The asset-based (or cost) approach values a company's nonpublicly traded stock by using one or more methods which look to the company's assets net of its liabilities.

## IV. Value of the Subject Shares

The stock of Glenwood Bank was not publicly traded. Thus, we look first to see whether there were any arm's-length sales of that stock near the applicable valuation date. Because neither coexecutor elected to value the estate's property under section

2032(a), that applicable valuation date is the date of decedent's death; i.e., September 2, 1996. See sec. 20.2031-1(b), Estate Tax Regs.

The record reflects three sales of Glenwood Bank stock near the applicable valuation date. The first two sales involved the 10 shares and 7 shares, respectively, which were sold before the valuation date. The third sale involved the 116 shares sold by the estate after the valuation date. In each of these sales, the buyer was Bancorporation.

Petitioners conceded at trial that they bear the burden of proof in this case. They acknowledge that an arm's-length sale of property near the valuation date is the best indicium of its fair market value on the valuation date, but, they assert, only certain sales near a valuation date are "competent, substantial and persuasive evidence" of that fair market value. According to petitioners, sales may be probative of fair market value only if they occur within a reasonable time before the valuation date. Petitioners primarily support this position with a citation of Douglas Hotel Co. v. Commissioner, 190 F.2d 766, 772 (8th Cir. 1951), affg. 14 T.C. 1136 (1950). They also assert that a prior sale of property conclusively sets the fair market value of that property on a later valuation date even if the seller was not knowledgeable of all relevant facts as to that property and even if the property that was the subject of the sale was not of

comparable size to the property subject to valuation.  They recognize that a determination of fair market value on the basis of actual sales has often been said to include requirements that a seller be knowledgeable and that the seller's property be comparable to the property subject to valuation.  They assert, however, that the Court of Appeals for the Ninth Circuit in Morrissey v. Commissioner, 243 F.3d 1145, 1149 (9th Cir. 2001), revg. Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119, eroded these requirements to now make them irrelevant.

We disagree with petitioners' assertion that the two prior sales of 10 shares and 7 shares, either separately or together, are an accurate measure of the applicable fair market value of decedent's 116 shares.  In Morrissey, the Court of Appeals for the Ninth Circuit held that sales of 10,000 and 6,960 shares of stock on May 12 and June 16, 1994, respectively, at $29.70 per share, reflected the fair market value of 46,020 shares of that stock as of an earlier valuation date of April 14, 1994.  The Court of Appeals stated that the sellers were under no compulsion to sell their shares and that they did so at the price that the buyer had represented was the price listed in a recent appraisal. The Court of Appeals stated that each seller testified at trial that the price was fair and that the sale had not been compelled.

Contrary to petitioners' assertion, we read nothing in Morrissey to indicate that the Court of Appeals for the Ninth

Circuit eroded the requirements that a seller of stock be
knowledgeable and that the seller's shares be comparable in
number to the shares subject to valuation in order for the sale
to be probative of a valuation of the latter shares.[1]  In fact,
the Court of Appeals noted specifically as to the knowledge
requirement that both sellers had sold their stock at
approximately the same price as listed in the appraisal and that
both sellers were aware that dividends had been meager even in
prosperous years.  Id. at 1148.  The Court of Appeals also
indicated as to the comparable property requirement that the
prior sales of stock were not unrepresentative of the stock
subject to valuation.  Id.

    As to the two prior sales of stock in this case, we also are
unpersuaded that either of those sales was made by a
knowledgeable seller who was not compelled to sell or was made at
arm's length.  See Estate of Fitts v. Commissioner, 237 F.2d at
731 (taxpayer bears the burden of establishing that sales are
made at arm's length and in the normal course of business).  In
addition, contrary to the factual setting of Morrissey v.
Commissioner, supra, the two prior sellers in this case did not
sell their stock for the amount set forth in an appraisal.  They

---

[1] We use the term "comparable in number" to mean that in
this respect, as in others, the characteristics of the property
offered as a comparable must not diverge so far from those of the
property being valued that they cannot be taken into account by
adjustments.

sold their stock for much less than the per-share value set forth in the later appraisal; the estate, in turn, sold its shares after the appraisal for more than the fair market value set forth therein. Moreover, the two respective prior sales represented 1 percent and .7 percent of Glenwood Bank's outstanding stock. Decedent's 116 shares, by contrast, represented 11.6 percent of that outstanding stock and were the only shares of Glenwood Bank stock not owned by the other shareholder. Mercer testified credibly that it was reasonably foreseeable as of the applicable valuation date that the other shareholder, Bancorporation, would eventually want to buy that 11.6-percent interest at some unknown time and that this added a special value to the interest. Our hypothetical seller would have known the same at the time of the hypothetical sale and as part of that hypothetical sale would have demanded compensation for this special value so as otherwise to not equate the selling price for the 10 shares and 7 shares with the hypothetical selling price of decedent's 116 shares.[2]

As to the third sale, which occurred on October 24, 1997, approximately 14 months after the applicable valuation date, we disagree with petitioners that only sales of stock that predate a valuation date may be used to determine fair market value as of

---

[2] In fact, petitioners are the only ones who have suggested that one or both of the two prior sales is an accurate measure of the fair market value of decedent's 116 shares as of the applicable valuation date.

that valuation date.  The Court of Appeals for the Eighth

Circuit, the court to which an appeal of this case most likely

lies, has held specifically that "In determining the value of

unlisted stocks, actual sales made in reasonable amounts at arm's

length, in the normal course of business, within a reasonable

time before or after the basic date, are the best criterion of

market value."  Estate of Fitts v. Commissioner, supra at 731;

accord Rubber Research, Inc. v. Commissioner, 422 F.2d 1402,

1405-1406 (8th Cir. 1970), affg. T.C. Memo. 1969-24; see also

Estate of Jung v. Commissioner, 101 T.C. 412, 430-432 (1993);

Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331.  Although

petitioners observe correctly that the Court of Appeals for the

Eighth Circuit stated in Douglas Hotel Co. v. Commissioner,

190 F.2d at 772, that "Evidence of what property sold for within

a reasonable time before the material date upon which its fair

value is to be determined is universally considered competent,

substantial, and persuasive evidence of its fair value on the

material date", this statement was made solely with respect to

the evidentiary value of a sale that predated the date of

valuation there.  The Court of Appeals did not state as

petitioners ask us to hold that only sales which occur before a

valuation date are probative as to fair market value on the

valuation date.  In fact, the Court of Appeals went on to state

specifically as to prior sales that "It is, of course, not the

only evidence which may be considered on the subject" of valuation.  Id.; accord Polack v. Commissioner, 366 F.3d at 612 ("subsequent events that shed light on what a willing buyer would have paid on the date in question are admissible, such as 'evidence of actual sales prices received for property after the date [in question], so long as the sale occurred within a reasonable time ... and no intervening events drastically changed the value of the property.'" (quoting First Natl. Bank v. United States, 763 F.2d 891, 894 (7th Cir. 1985))); see also Estate of Jung v. Commissioner, supra at 431-432; Estate of Scanlan v. Commissioner, supra.

Generally speaking, a valuation of property for Federal tax purposes is made as of the valuation date without regard to any event happening after that date.  See Ithaca Trust Co. v. United States, 279 U.S. 151 (1929).  An event occurring after a valuation date, however, is not necessarily irrelevant to a determination of fair market value as of that earlier date.  An event occurring after a valuation date may affect the fair market value of property as of the valuation date if the event was reasonably foreseeable as of that earlier date.  First Natl. Bank v. United States, supra at 894; Bank One Corp. v. Commissioner, 120 T.C. at 306.  An event occurring after a valuation date, even if unforeseeable as of the valuation date, also may be probative of the earlier valuation to the extent that it is relevant to

establishing the amount that a hypothetical willing buyer would have paid a hypothetical willing seller for the subject property as of the valuation date.[3]  Polack v. Commissioner, supra at 612; First Natl. Bank v. United States, supra at 893-894; Estate of Gilford v. Commissioner, 88 T.C. 38, 52-54 (1987); Estate of Jephson v. Commissioner, 81 T.C. 999, 1002-1003 (1983); Estate of Scanlan v. Commissioner, supra.  Unforeseeable subsequent events which fall within this latter category include evidence, such as we have here, "'of actual sales prices received for property after the date [in question], so long as the sale occurred within a reasonable time ... and no intervening events drastically changed the value of the property.'"  Polack v. Commissioner, supra at 612 (quoting First Natl. Bank v. United States, supra at 894); First Natl. Bank v. United States, supra at 893-894; see also Estate of Jung v. Commissioner, supra at 431-432; Estate of Scanlan v. Commissioner, supra.

---

[3] Subsequent events may be considered as evidence of value if they are relevant.  Federal law favors the admission of probative evidence, and the test of relevancy under Federal law is designed to reach that end.  Sabatino v. Curtiss Natl. Bank, 415 F.2d 632, 636 (5th Cir. 1969).  Fed. R. Evid. 401, a rule that applies to this Court under Rule 143(a), states broadly that evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401 favors a finding of relevance, and only minimal logical relevance is necessary if the disputed fact's existence is of consequence to the determination of the action.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 587 (1993).

Petitioners try to downplay the importance of the subsequent (third) sale of the estate's 116 Glenwood Bank shares by characterizing it as a sale to a strategic buyer who bought the shares at greater than fair market value in order to become the sole shareholder of Glenwood Bank. Respondent argues that the third sale was negotiated at arm's length and is most relevant to our decision. We agree with respondent. Although petitioners observe correctly that an actual purchase of stock by a strategic buyer may not necessarily represent the price that a hypothetical buyer would pay for similar shares, the third sale was not a sale of similar shares; it was a sale of the exact shares that are now before us for valuation. We believe it to be most relevant that the exact shares subject to valuation were sold near the valuation date in an arm's-length transaction and consider it to be of much less relevance that some other shares (e.g., the 10 shares and 7 shares discussed herein) were sold beforehand. The property to be valued in this case is not simply any 11.6-percent interest in Glenwood Bank; it is the actual 11.6-percent interest in Glenwood Bank that was owned by decedent when she died. See Bank One Corp. v. Commissioner, supra at 311-312.[4] The two prior sales of 10 shares and 7 shares, respectively, left decedent's 11.6-percent interest as the only interest not owned by the other

_____

[4] Of course, we value that actual 11.6-percent interest in the context of a hypothetical willing buyer and a hypothetical willing seller.

shareholder. The fact that decedent's specific 11.6-percent interest may have included a unique attribute that added value to that interest vis-a-vis another 11.6-percent interest in Glenwood Bank does not detract from the fair market value of decedent's interest. That attribute would continue to be retained by the hypothetical buyer in our analysis following our hypothetical sale just as it had been retained by decedent at the time of her death.

Moreover, as to petitioners' argument, we are unpersuaded by the evidence at hand that Glenwood was a strategic buyer that in the third sale paid a premium for the 116 shares. The third sale was consummated by unrelated parties (the estate and Bancorporation) and was prima facie at arm's length. In addition, the estate declined to sell its shares at the value set forth in the appraisal and only sold those shares 5 months later at a higher price of $1.1 million. Although the estate may have enjoyed some leverage in obtaining that higher price, as suggested by Mercer by virtue of the fact that the subject shares were the only Glenwood Bank shares not owned by the buyer, this does not mean that the sale was not freely negotiated, that the sale was not at arm's length, or that either the estate or Bancorporation was compelled to buy or to sell. In fact, Mercer through his own analysis pegged the fair market value for those shares as of the time of the third sale at approximately $1.9

million, or, in other words, almost twice the amount of the price actually received.  Given the additional facts that the third sale occurred sufficiently close to the applicable valuation date and that the record does not reveal any material change in circumstances that occurred between that date and the date of the third sale that would have affected the fair market value of the subject shares, we conclude on the basis of the limited evidentiary record before us that the third sale is the best indicium of the fair market value of decedent's shares at the time of her death.[5]  See Estate of Fitts v. Commissioner, 237 F.3d at 731; Rubber Research, Inc. v. Commissioner, 422 F.2d at 1406; Ward v. Commissioner, 87 T.C. 78, 101 (1986); Estate of Andrews v. Commissioner, 79 T.C. at 940; see also Silverman v. Commissioner, 538 F.2d 927, 931 n.7 (2d Cir. 1976) ("Arm's length sales of the stock to be valued are, of course, the best evidence

_____

[5] We find nothing in the record to support the conclusion which we draw from the Mercer report that the fair market value of the subject shares almost doubled from the applicable valuation date to the time of the third sale and, in light of the third sale, are unpersuaded by that report's conclusion as to the applicable fair market value of those shares.  Mercer opined that the third sale was an arm's-length sale that involved a seller who at the time of the third sale lacked knowledge that the value of its stock exceeded the $1.1 million sale price.  The fact that a more knowledgeable seller might have extracted a higher sale price for the subject shares does not on the record before us detract from the probative value of the third sale.  At the least, the price in that sale serves as a floor to the fair market value of the subject shares and, given that respondent does not request a higher value, serves in our opinion as the best measure of the fair market value of the subject shares as of the applicable valuation date.

of value."(citing Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 39 (1937), and Rubber Research, Inc. v. Commissioner, supra at 1406))), affg. T.C. Memo. 1974-285; accord Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331. To be sure, petitioners even advocate that an actual sale is the best indicium of that fair market value. They state in brief that expert testimony need not be considered upon the finding of a contemporaneous, arm's-length sale; such a sale of property, they state, is "indicative of its fair market value as a matter of law".

When a subsequent event such as the third sale before us is used to set the fair market value of property as of an earlier date, adjustments should be made to the sale price to account for the passage of time as well as to reflect any change in the setting from the date of valuation to the date of the sale. See Estate of Scanlan v. Commissioner, supra. These adjustments are necessary to reflect happenings between the two dates which would affect the later sale price vis-a-vis a hypothetical sale on the earlier date of valuation. These happenings include: (1) Inflation, (2) changes in the relevant industry and the expectations for that industry, (3) changes in business component results, (4) changes in technology, macroeconomics, or tax law, and (5) the occurrence or nonoccurrence of any event which a hypothetical reasonable buyer or a hypothetical reasonable seller would conclude would affect the selling price of the property

subject to valuation (e.g., the death of a key employee).  See

Estate of Jung v. Commissioner, 101 T.C. at 431.

The record before us does not establish the presence of any

material change in circumstances between the date of the third

sale and the applicable valuation date.  On the basis of the

record before us, we believe that the sole adjustment that must

be made to the $1.1 million sale price in order to arrive at the

fair market value of the subject shares as of the applicable

valuation date is for inflation.  While the record does not

accurately pinpoint the appropriate rate to apply for that

purpose, the Bureau of Labor Statistics has stated that the rate

of inflation during each of the years 1996 and 1997 was slightly

less than 3 percent.  See generally Handbook of U.S. Labor

Statistics, Employment, Earnings, Prices, Productivity, and Other

Labor Data 342 (7th ed. 2004).  On the basis of a 3-percent rate,

we conclude that the applicable fair market value of decedent's

116 shares was $1,067,000 ($1,100,000 x (1 - .03)).[6]  We so hold.

---

[6] Although we do not determine this fair market value on the
basis of the methodology applied by Herber, we note that this
fair market value approximates the average of the resulting
values derived by Herber through the application of his four
methods.

All arguments made by the parties have been considered and, to the extent not discussed herein, are irrelevant and/or without merit.  To reflect concessions,

<u>Decision will be entered under Rule 155</u>.