T.C. Memo. 2014-155

UNITED STATES TAX COURT

ESTATE OF FRANKLIN Z. ADELL, DECEASED, KEVIN R. ADELL, TEMPORARY CO-PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1188-11.                    Filed August 4, 2014.

Steven Spencer Brown, Denis John Conlon, Royal B. Martin, Jr., and William Gibbs Sullivan, for petitioner.

John W. Stevens and Angela B. Reynolds, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge:  In a notice of deficiency, respondent determined a Federal estate tax deficiency of $39,673,096 with respect to the Estate of Franklin Z. Adell

**[*2]** (estate).  Respondent also determined a section 6662[1] substantial estate tax valuation understatement penalty of $15,267,768 due to a gross valuation misstatement as defined by section 6662(h)(2)(C).  After concessions, the issue remaining for decision is the fair market value of  Franklin Z. Adell's (Mr. Adell) 100% interest in STN.Com, Inc. (STN.Com), on August 13, 2006, the date of his death.[2]  The Court must also decide whether the substantial estate tax valuation understatement penalty applies.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts, the exhibits attached thereto, and the exhibits admitted at trial or admitted by order are incorporated herein by this reference.

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the date of Franklin Z. Adell's death, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2]In addition to making concessions, the parties have further adjusted the valuation issue for purposes of trial.  On its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, filed on November 13, 2007, the estate initially reported the value of Mr. Adell's interest in STN.Com as $9.3 million.  At trial and on brief petitioner argues that the value of Mr. Adell's STN.Com interest on his date of death was $4.3 million.  In the notice of deficiency, respondent proposed a value of $92,277,000, for a purported adjustment of $85,937,657, but now respondent argues that the value of Mr. Adell's interest in STN.Com was $26,341,030.

[*3]   Mr. Adell died on August 13, 2006, when he was a legal resident of Michigan.  Mr. Adell's estate is being probated under the laws of the State of Michigan.  Kevin R. Adell (Kevin), Mr. Adell's son and the estate's co-personal representative, resided in Michigan when the petition was filed.[3]

Mr. Adell was married to Sharon Adell, who died before him.  They had three children, Kevin, Julie Verona, and Laurie Fischgrund.  On July 17, 2002, Mr. Adell created the Franklin Z. Adell Trust (Adell Trust).  The trust instrument was amended and restated on October 31, 2003.  Mr. Adell's three children were equal beneficiaries of the Adell Trust.  The values of the Adell Trust's assets are included in the value of Mr. Adell's gross estate.  One of the assets, and the

---

[3]In 2009 Mr. Adell's daughters, Julie Verona and Laurie Fischgrund, filed a lawsuit against Kevin as the personal representative of the estate in the probate court of Oakland County, Michigan.  On April 26, 2010, the Oakland County probate court appointed Joseph Ehrlich as the successor temporary personal representative of the estate.  On August 11, 2010, the Oakland County probate court appointed Ms. Verona and Ms. Fischgrund as successor co-personal representatives of the estate.  After reaching a settlement with Kevin regarding the probate of the estate, Ms. Verona and Ms. Fischgrund were discharged as co-personal representatives of the estate by a court order dated February 22, 2012.  Kevin was appointed as the temporary co-personal representative of the estate on January 13, 2011, in part, to petition this Court concerning the value of STN.Com.

**[*4]** subject of the dispute herein, is Mr. Adell's 100% interest in STN.Com, Inc. (STN.Com), a cable uplinking company.[4]

I. Background of STN.Com

Before Mr. Adell became involved with cable uplinking, he invented a car door edge guard in 1952 and ran a door guard manufacturing business with his brothers. In 1978 Mr. Adell decided to pursue an opportunity in television broadcasting. He applied for a television license, which he received 10 years later in 1988. At that time Mr. Adell's son, Kevin, was finishing his degree in communications at Arizona State University. Mr. Adell, who continued to work for his family's automotive company during the day, convinced his son to return home to Michigan and help him build a television station. With loans and money from his parents, Kevin built the television station WADL for his father, Mr. Adell.[5] WADL went on the air in 1989 and initially broadcasted infomercials.

---

[4]In addition to his interest in STN.Com, Mr. Adell transferred the following property to the Adell Trust during his lifetime: Treasury bills and accrued interest with a date-of-death value of $4,504,529; a $3.2 million home; Mr. Adell's 100% interest in Birmingham Properties, Inc. (Birmingham Properties), with a date-of-death value of $960,166; and Mr. Adell's 86% interest in Adell Broadcasting Corp., Inc. (Adell Broadcasting), with a date-of-death value of $6 million.

[5]Adell Broadcasting, a C corporation, owned and operated WADL. Mr. Adell owned an 86% interest in Adell Broadcasting that he transferred to the Adell Trust during his life. Mr. Adell's interest in Adell Broadcasting had a date-of-

(continued...)

**[\*5]** Several years later, after a competitor lost its affiliation with a local channel, WADL was able to contract all of the religious programming that was previously broadcasted on the other channel.

In 1994 Mr. Adell formed STN Satellite Television Network, Inc. (STN Satellite), a Nevada corporation that provided satellite uplinking services. Mr. Adell purchased a building for his uplinking business that was separate from the WADL location.[6] Kevin hired a company to apply for an uplink license and the uplink license was issued to "STN".[7] Kevin handled the day-to-day operations and began to learn about the uplinking business by providing satellite uplinking services on a contract basis for various customers, including Hughes Electronics Corp., a subsidiary of General Motors. STN Satellite's contract with Hughes

[5](...continued)
death value of $6 million. See supra note 4.

[6]Birmingham Properties, an S corporation wholly owned by Mr. Adell, owned the building. STN.Com paid Birmingham Properties $20,000 a month in rent. Mr. Adell transferred his interest in Birmingham Properties to the Adell Trust during his life, and as of his date of death, Birmingham Properties had a value of $960,166. See supra note 4.

[7]At trial Kevin testified that the name on the uplink license was "STN", referring to STN Satellite, but he could not remember whether he had changed the name on the license to "STN.Com". After STN.Com's incorporation in 1999, Mr. Adell and Kevin used the names STN, STN.Com, and Satellite Television Network, Inc., interchangeably.

[*6] Electronics Corp. lasted for two years, from 1997 through 1999, and was terminated around the time Kevin saw an opportunity to create STN.Com, a new entity to operate Mr. Adell's uplinking business.

Mr. Adell incorporated STN.Com on June 29, 1999, as a C corporation in the State of Michigan. Mr. Adell was STN.Com's sole shareholder until July 17, 2002, when he transferred his 100% interest in STN.Com consisting of 1,000 shares of common stock to the Adell Trust. From the date of incorporation through the date of Mr. Adell's death, STN.Com's board of directors included Mr. Adell, Kevin, and Ralph G. Lameti.[8] Kevin served as STN.Com's president, but he never had an employment agreement or a noncompete agreement with STN.Com. STN.Com's sole business purpose was to broadcast an urban religious program[9] channel that Kevin named "The Word Network" (The Word).

---

[8]Mr. Lameti, who is a certified public accountant and has a law degree, did all of the accounting work for Mr. Adell and his family. Mr. Lameti's firm provided accounting services for STN.Com.

[9]On Form 990, Return of Organization Exempt From Income Tax, Mr. Adell and Kevin specified the broadcasting of "urban religious programs" as The Word's exempt purpose. For consistency, the Court will adopt the term from the Form 990 when describing the programming of STN.Com.

[*7] II.  STN.Com and The Word

Before The Word, Kevin was looking for programming content to create an entertainment channel.  He pitched various ideas for a channel, such as a 24-hour channel documenting General Motors cars and manufacturing since the company was headquartered in Michigan, but those ideas never got off the ground.  Kevin was familiar with religious programming so he decided to create a 24-hour station broadcasting urban religious ministries and gospel music, which he called The Word.  To gain support for The Word, Kevin met with religious leaders in the Detroit area, including Bishop Charles Haywood Ellis, and Reverend Jesse Jackson, Sr., in Chicago.  They agreed to help Kevin launch The Word.

In October 1999 Mr. Adell, Kevin, Mr. Lameti, Rev. Jackson, and Bishop Ellis went to Los Angeles to meet with the president of DirecTV about The Word.  Kevin presented his idea for a 24-hour urban religious program channel, and Rev. Jackson and Bishop Ellis explained the need for urban ministries to reach a national audience.  The DirecTV representatives were interested in broadcasting The Word and asked Kevin to prepare a business plan.  They also gave Kevin a deadline for creating The Word, which had to be a nonprofit entity in order to use the available broadcast space.

[*8]   On October 27, 1999, Kevin and Mr. Adell incorporated World Religious Relief as a Michigan nonprofit to operate as The Word.  According to its articles of incorporation, The Word was organized exclusively for charitable, educational, and scientific purposes as described in section 501(c)(3), and no part of its assets or net earnings could inure to the benefit of or be distributable to its directors, officers, or other private persons.[10]  Mr. Adell was the president and a director of The Word, and Kevin was the treasurer, secretary, and a director of The Word.[11]

STN.Com purchased and operated the equipment used to uplink The Word's urban religious programming and provided 30 to 35 employees to broadcast The Word.  On November 24, 1999, The Word and STN.Com signed a Services and Facilities Agreement (services agreement) in which STN.Com agreed to provide "such executive, management, legal, technical, supervisory, administrative,

---

[10]When Kevin contacted ministers about programming content and cable companies for broadcasting opportunities, he was often asked whether ownership in The Word was available.  Kevin indicated that because The Word was a nonprofit, the ministers and cable companies could not receive an ownership interest.

[11]Until Mr. Adell's date of death in August 2006, Mr. Adell and Kevin were the only employees of The Word.  According to its Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, The Word represented that it would not provide compensation to its officers and directors.  However, The Word's articles of incorporation provide that it may pay reasonable compensation for services.

[*9] accounting, clerical, and other services and such facilities as * * * [The Word] may reasonably require in order to effectively run its operations, as requested from time to time by the Board of Directors or the President of * * * [The Word]". In consideration, The Word agreed to pay STN.Com a monthly programming fee equal to "the lesser of actual cost or ninety-five percent of net programming revenue received by * * * [The Word] in a one month period". The parties agreed that the programming fee would not exceed STN.Com's "actual direct costs and allowable indirect costs".[12]

The services agreement was scheduled to take effect on February 1, 2000, and terminated upon the earliest of: (1) mutual written consent of the parties; (2) termination of The Word's right to use the DirecTV channel; (3) The Word's failure to pay the monthly programming fee within five business days after the due date; or (4) The Word's exercise of an option to terminate the agreement if STN.Com failed to transmit The Word's programming to the DirecTV channel for

---

[12]According to the services agreement, the costs must be reasonable and include: "(a) Reasonable amounts paid to all independent contractors * * * (b) Reasonable direct costs * * * (c) A reasonable allocation of salaries, wages, employee benefits, and the employer's share of payroll taxes * * *; and (d) A reasonable allocation of overhead costs".

[*10] a specified length of time.[13]  Mr. Adell signed the services agreement as president of The Word, and Kevin signed the agreement as president of STN Satellite.[14]

On or around November 26, 1999, Kevin and Mr. Adell filed The Word's Form 1023.  According to the Form 1023, The Word received an oral commitment from DirecTV to broadcast its nonprofit programming, and it intended to offer its programming to other large cable companies.  According to the oral agreement, The Word was responsible for arranging all programming content, including contacting ministers, clergy, and other religious leaders who had local television programs and offering to broadcast their programs for a reduced fee.  STN.Com was responsible for sending The Word's signal to a satellite, and DirecTV agreed to take the programs off the satellite and broadcast them nationally.

Also on the Form 1023, The Word represented that its programming would be strictly noncommercial and would include educational and theological

---

[13]The service contract gives The Word an option to terminate the agreement if STN.Com fails to transmit programming to the DirecTV channel for "more than 48 hours for seven (7) or more consecutive days, during the term of this Agreement", which the Court finds ambiguous.

[14]At trial Kevin testified that it was a clerical mistake that STN Satellite was listed instead of STN.Com.  From 2000 through Mr. Adell's date of death in 2006, Mr. Adell was president of The Word and Kevin was president of STN.Com.

[*11] broadcasts.  The Word also disclosed that Mr. Adell and Kevin, who were officers and directors of The Word, were principals of two entities, Adell Broadcasting and STN.Com, that agreed to fund The Word's startup costs.  The Word represented that any financial transactions with Adell Broadcasting and STN.Com would be at arm's length and below cost to prevent any private inurement, and any unreimbursed expense incurred by STN.Com would be treated as a donation.  Broadcasts of The Word began on February 14, 2000; and on May 11, 2000, The Word received its section 501(c)(3) tax-exempt status.

Pursuant to the services agreement, and continuing through Mr. Adell's date of death, The Word paid STN.Com at least 95% of its revenue each month.[15]  The Word's primary source of revenue was from broadcasting contracts that Kevin, as a representative of The Word, negotiated and entered into with ministers and their religious affiliates.  STN.Com's primary source of income came from the program fees it received from The Word, STN.Com's only customer.[16]

---

[15]In 2002 and 2003 The Word's programming payment to STN.Com exceeded 100% of its reported programming revenues.  At trial Mr. Lameti indicated that the one-month difference in tax yearends for The Word and STN.Com--The Word's ended in May and STN.Com's ended in June--could have caused the excess payments to STN.Com in 2002 and 2003.

[16]According to the notes to its financial statements for the tax years ending (TYE) June 30, 2002 through 2006, STN.Com derived its entire broadcast revenue

(continued...)

- 12 -

[*12]  The Word and STN.Com filed returns for the years leading up to Mr. Adell's death.  The Word filed Forms 990 for its tax years ending (TYE)[17] May 31, 2002 through 2006, and reported the following amounts in broadcasting revenue and programming fees paid to STN.Com:

| TYE | The Word's revenue | STN.Com's fee | STN.Com's gross receipts |
|-----|-----|-----|-----|
| 2002 | $7,639,772 | $7,668,016 | $7,894,164 |
| 2003 | 9,307,532 | 9,490,923 | 9,079,734 |
| 2004 | 10,767,473 | 10,229,099 | 10,462,062 |
| 2005 | 14,099,195 | 13,394,235 | 13,627,870 |
| 2006 | 16,770,985 | 15,932,436 | 15,866,995 |

In addition to paying STN.Com's fee, The Word also reported compensation paid to its officers listed on its Forms 990 as:  Mr. Adell, CEO; 15 hours/week devoted to position and Kevin, president; 10 hours/week devoted to position.

_____

[16](...continued)
from The Word, which "pays 95% of its broadcasting revenue to * * * [STN.Com]".  The notes do not mention that STN.Com's broadcasting revenue is limited to the lesser of its costs or 95% of The Word's broadcasting revenue, as provided in the services agreement.

[17]The parties sometimes use the term "fiscal year ending" instead of TYE. The Court will use TYE for consistency.

**[*13]**                     Compensation from The Word

| TYE | Mr. Adell, CEO 15 hrs./wk. devoted to position | Kevin, president[1] 10 hrs./wk. devoted to position |
|---|---|---|
| 2002 | $45,833 | $45,833 |
| 2003 | 50,000 | 50,000 |
| 2004 | 50,000 | 50,000 |
| 2005 | 50,000 | 50,000 |
| 2006 | 50,000 | 50,000 |

[1]The discrepancy in Form 990 officer titles, i.e., Mr. Adell, CEO, and Kevin, president, was not addressed in testimony or other exhibits. The original Form 1023 listed Mr. Adell as president and Kevin as treasurer and secretary. See supra pp. 8-10 and note 11 for discussion on Form 1023 application and service agreement.

STN.Com filed Forms 1120, U.S. Corporation Income Tax Return, for its TYE June 30, 2002 through 2006, based on financial statements prepared by Mr. Lameti's accounting firms. According to its corporate returns and financial statements, STN.Com reported the following amounts in gross receipts, retained earnings, shareholder equity, and assets:

| TYE | Gross receipts | Retained earnings | Shareholder equity | Assets |
|---|---|---|---|---|
| 2002 | $7,894,164 | [1]$557,642 | $558,643 | [1]$2,242,052 |
| 2003 | 9,079,734 | 1,416,587 | 1,417,587 | 3,068,332 |
| 2004 | 10,462,062 | [1]2,720,937 | 2,721,936 | [1]3,623,778 |

[*14]

| Year | | | | |
|------|------|------|------|------|
| 2005 | 13,627,870 | 3,521,199 | 3,522,199 | [1]5,631,223 |
| 2006 | 15,866,995 | 3,842,488 | 3,843,488 | 4,922,732 |

[1]The Court will assume that minor differences between these numbers as they appear on the tax returns and on the financial statements are due to rounding.

STN.Com used the program fees it received from The Word to pay its expenses. STN.Com's expenses included a monthly $20,000 rent payment to Mr. Adell's wholly owned S corporation, Birmingham Properties, and compensation to its officers and employees. STN.Com's largest expense was compensation for Mr. Adell and Kevin.[18] During its TYE in June 2002 through 2006, STN.Com paid Mr. Adell and Kevin the following amounts in compensation:

|  | Compensation from STN.Com | |
|------|------|------|
| TYE | Mr. Adell | Kevin |
| 2002 | $2,050,000 | $1,115,000 |
| 2003 | 2,373,507 | 1,207,155 |
| 2004 | 3,978,143 | 223,488 |
| 2005 | 6,751,948 | 241,336 |
| 2006 | 7,354,594 | 1,292,758 |

[18]These amounts do not include notes receivable from Kevin to STN.Com, more specifically described infra note 22.

[*15] Mr. Adell's date of death was August 13, 2006, so for its TYE June 2007 STN.Com paid Mr. Adell's compensation of $1,157,976 to the Adell Trust. In TYE June 2007 and 2008 STN.Com paid Kevin compensation of $9,734,643 and $8,204,066, respectively.[19]

In addition to rent and compensation, STN.Com made several miscellaneous payments that were primarily for the personal benefit of Mr. Adell and Kevin. STN.Com leased luxury cars, including Bentleys and Rolls-Royces, used for personal and work purposes by Mr. Adell, Kevin, and its other employees.[20] STN.Com also helped Mr. Adell and Kevin purchase and maintain real estate. For

---

[19]STN.Com amended its corporate returns for 2007 and 2008 to increase deductions on its original returns to recharacterize dividend payments as compensation to Kevin, thereby increasing his compensation for those tax years. See infra note 30.

[20]During TYE June 2003 through 2007 STN.Com had prepaid auto lease expenses of $27,145, $103,042, $114,895, $118,001, and $48,969, respectively. According to the estate's return, Mr. Adell owned a Bentley Continental GT that had a date-of-death value of $130,000 and two Rolls-Royces with date-of-death values of $225,000 for the Phantom and $130,000 for the Corniche. As of June 2009 Kevin received use of one company owned or leased luxury car that was not included as wage income and nine other luxury cars that were included as part of his compensation from STN.Com. The estate objected to this evidence on the basis of relevancy. The Court reserved ruling on this objection, and now overrules it to the extent that the evidence is relevant to show that STN.Com was indeed a profitable corporation during and immediately after Mr. Adell's life.

[*16] example, STN.Com gave money to Mr. Adell and Kevin to purchase a condominium in Los Angeles, California, and guaranteed the mortgage.[21] STN.Com purchased high-end furnishings for the condominium and for Mr. Adell's home in Michigan and paid all expenses, including the mortgage, interest, and insurance, related to Kevin's second home in Florida. In 2002 STN.Com paid $300,000 toward Kevin's home in Florida. From July 2002 through June 2003 STN.Com paid between $300,000 and $400,000 of Kevin's personal legal fees for litigation involving a dispute with a home contractor.[22] In 2006 Mr. Adell paid a $6 million judgment entered against Kevin using funds from Mr. Adell's salary at

---

[21]Kevin claimed that the money received from STN.Com was reported as wage income to Mr. Adell and Kevin. The estate did not provide evidence supporting Kevin's claims and instead objected on the grounds of relevancy. The Court overrules the estate's objection and finds the evidence relevant to show that STN.Com was indeed a profitable corporation. As of Mr. Adell's date of death, the condominium had a reported value of $1,675,579.

[22]These payments were later recharacterized as loans from STN.Com to Kevin which the financial statements show were substantially repaid after Mr. Adell's death. These loans to Kevin were represented by demand promissary notes. The maximum cumulative balance of the notes was $985,010, and STN.Com's financial statements showed yearend balances due from Kevin in the following amounts for TYE June 2003 through 2007: $430,085, $941,939, $955,858, $969,778 and $264,662, respectively.

[*17] STN.Com.[23]  Kevin filed for bankruptcy and moved to Florida in 2003, where he continues to maintain a residence.[24]

Mr. Adell's daughters also personally benefited from STN.Com.  During 2006 through 2008 the Adell Trust made payments to Ms. Verona and Ms. Fischgrund which were funded by dividend payments made from STN.Com to the Adell Trust.[25]  In addition, although STN.Com never employed Ms. Verona, Mr. Adell, individually and as trustee of the Adell Trust, directed STN.Com to pay Ms. Verona's health insurance coverage from approximately 2001 until Mr. Adell's death in 2006.  STN.Com continued the payments until 2007.

After Mr. Adell's death in 2006 Kevin was appointed chief executive officer, in addition to already being president of STN.Com, and Mr. Lameti was

---

[23]On the estate's original Form 706, the judgment was reported under Schedule F, Other Miscellaneous Property, as a loan receivable and asset of the estate with a value of $6,667,018.  On the estate's first amended Form 706, the judgment was recharacterized as a gift from Mr. Adell to Kevin in the amount of $6,655,018 and reported under Schedule G, Transfers During Decedent's Life. The parties have agreed to treat the $6.6 million payment as a gift.  See infra p. 21; see also Estate of Adell v. Commissioner, T.C. Memo. 2014-89.

[24]In subsequent gift tax litigation, Kevin claimed Florida as the then-current residence of the personal representative.  The Court recognizes that the related cases now lie in different appellate jurisdictions.

[25]In 2008 these payments were recharacterized as compensation paid by STN.Com to Kevin, who then loaned the funds to the Adell Trust.

[*18] named the chief financial officer of STN.Com. Kevin continued to operate STN.Com in the same manner as before Mr. Adell died.[26] In fact, STN.Com continued to generate significant gross receipts for its TYE June 2007 and 2008 and reported gross receipts of $18,510,969 and $17,987,701, respectively.

In September 2008 Ms. Verona and Ms. Fischgrund filed a lawsuit in the probate court of Oakland County, Michigan, against Kevin as trustee of the Adell Trust. In 2009 they filed a second lawsuit in the probate court against Kevin as personal representative in administration of the estate. Because the probate court litigation affected STN.Com, Kevin testified that he created a new company, International Broadcasting Services, Inc. (International Broadcasting), to provide the uplinking services The Word needed to continue its business.

Kevin filed articles of incorporation for International Broadcasting on June 30, 2010. He is the sole owner. On or around July 10, 2010, almost four years after Mr. Adell's death, Kevin resigned from STN.Com, and all of STN.Com's employees except for one resigned and became employees of International

---

[26]Notably, Kevin continued to use STN.Com for his personal benefit. In September 2007, using a $2.2 million bank loan, STN.Com purchased an 85-foot yacht, which Kevin kept at his home in Florida and used for personal purposes. STN.Com also paid for the captain and crew of the yacht. In 2008 STN.Com advanced $701,000 to Kevin to set up his company, Novi Trade Center, LLC. STN.Com advanced a total of $1,491,626.48 to Novi Trade Center, LLC, from January 2007 through June 2008.

[*19] Broadcasting. Beginning in July 2010 The Word changed its uplinking provider from STN.Com to International Broadcasting. On July 20, 2010, The Word and International Broadcasting signed a new Services and Facilities Agreement that was identical to the one between STN.Com and The Word. Mr. Lameti signed the new agreement on behalf of The Word, and Kevin signed on behalf of International Broadcasting. At this time, all of the uplinking equipment owned by STN.Com was transferred to The Word without consideration, and STN.Com ceased operations as of 2010.

III. Estate Tax Return

Mr. Adell died on August 13, 2006. Kevin was appointed personal representative of the estate and trustee of the Adell Trust.[27] On April 26, 2007, respondent received the estate's Form 4768, Application for Extension of Time to File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes, requesting a six-month extension to pay its estate tax liability.[28]

---

[27]Mr. Lameti was the appointed trustee of the Adell Trust on August 13, 2006, but he resigned and appointed Kevin as trustee on August 14, 2006. Kevin served as trustee of the Adell Trust until September 1, 2009.

[28]The estate expected to make a sec. 6166 election computing the deferred and nondeferred portions of the estate tax on the basis of the portion attributable to the closely held businesses and was waiting for the valuations of Mr. Adell's closely held businesses, Adell Broadcasting, Birmingham Properties, and

(continued...)

[*20] On November 13, 2007, the estate filed a Form 706 reporting an estate tax due of $15,288,517.  Included with the Form 706 was a statement in which the estate elected under section 6166 to defer $7,193,960 of the total estate tax attributable to the closely held businesses' assets for five years and then pay the deferred estate tax in 10 annual installments.[29]  The estate paid the nondeferred estate tax of $8,094,557 when it filed the Form 706 on November 13, 2007.[30]

Attached to the estate's return was, inter alia, a Schedule G showing Mr. Adell's transfers to the Adell Trust during his life.  Among the transfers were Mr.

---

[28](...continued)
STN.Com.  The parties have not addressed whether any estate tax lien provisions required under secs. 6166 and 6324A were violated when STN.Com transferred all of its uplinking equipment without consideration.

[29]For a discussion of the estate's sec. 6166 election and its petition to the Court regarding the same, see Estate of Adell v. Commissioner, T.C. Memo. 2013-228.

[30]STN.Com executed a $3,040,000 capital stock redemption to pay the nondeferred portion of the estate tax.  In addition, on or around November 9, 2007, STN.Com loaned the Adell Trust $1.8 million to pay the estate's income tax liability.  The payment was originally intended to be a stock redemption, but in 2008 it was recharacterized as compensation paid by STN.Com to Kevin, which Kevin then loaned to the Adell Trust.  The parties have not addressed the tax consequences under sec. 303 in regard to distributions in redemption of stock to pay death taxes versus recharacterizing the amount as compensation.  The original estate tax return reflected a $9,300-per-unit value of STN.Com.  The trust owned 1,000 shares for a $9.3 million value.  The shareholder equity reflected on STN.Com's 2006 financial statement was $3.8 million.

**[\*21]** Adell's shares of stock in: Birmingham Properties, with a reported date-of-death value of $960,166; Adell Broadcasting, with a reported date-of-death value of $6 million; and STN.Com, with a reported date-of-death value of $9.3 million. The STN.Com stock's reported value was based on a valuation report prepared by Stout Risius Ross, Inc. (Stout Risius Ross), and certified by Jeffrey M. Risius, one of the estate's expert witnesses.[31]

The estate amended its estate tax return twice. The estate's Form 706 was amended for the first time on November 17, 2008, over a year after the filing of its original return. On the first amended return, the $6.6 million payment Mr. Adell made on behalf of Kevin to discharge a judgment in 2006 was recharacterized by the estate from a note payable to Mr. Adell or a loan receivable to the estate to a taxable gift from Mr. Adell to Kevin. By recharacterizing the receivable as a gift, the estate reduced its total transfer taxes from $15,288,517, as originally reported,

---

[31]For a discussion of Mr. Risius' valuation report attached to the estate's original Form 706, see infra pp. 23-29.

[*22] to $12,393,889.[32]  The first amended estate return did not adjust the STN.Com stocks's date-of-death value from the originally reported $9.3 million.

Respondent received the estate's second amended Form 706 on August 10, 2010, almost four years after Mr. Adell died.  On the second amended return, the estate changed its original return position and reported that the STN.Com stocks's date-of-death value was zero instead of $9.3 million.  The estate's total transfer taxes were reduced to $8,115,889, and the value attributable to the closely held business assets was reduced from $16,263,166 to $6,960,166.

On November 9, 2010, respondent issued a notice of deficiency to the estate in which respondent determined an estate tax deficiency of $39,673,096.  In the notice, respondent determined, inter alia, that the date-of-death value of the STN.Com stock that Mr. Adell had transferred to the Adell Trust was over $92.2 million, instead of $9.3 million reported on the original Form 706 filed on

---

[32] The first amended estate tax return requested that the previously remitted estate tax payment of $8,094,557, paid in November 2007, be reallocated to apply $5,205,449 to the amended return balance of $12,393,889.  The first amended return also indicated that the remaining $2,889,108 of the $8,094,557 payment made with the original return should be applied to Mr. Adell's taxable gifts.  The Court previously decided that because there was not an available overpayment of estate tax, the $2,889,108 previously remitted as estate tax could not be applied to the gift tax liability.  See Estate of Adell v. Commissioner, T.C. Memo. 2014-89; see also supra notes 23 and 29.

[*23] November 13, 2007.[33]  Kevin, as the estate's representative, timely filed a petition with the Court.

IV.  Valuation Reports

    A.  Mr. Risius' June 15, 2007, Valuation Report

Mr. Risius was primarily responsible for preparing the first valuation report of the STN.Com stock that was attached to the estate's original return.  In preparing the report, Mr. Risius considered the factors listed in Rev. Rul. 59-60, 1959-1 C.B. 237.  He relied on STN.Com's financial statements for the TYE June 30, 2002 through 2006, the services agreement between The Word and STN.Com, The Word's bylaws, and a schedule of compensation paid to STN.Com's officers for the TYE June 30, 2002 through 2006.  Mr. Risius also spoke with STN.Com's management regarding its business, industry, history, and prospects.

---

[33]The notice of deficiency did not reference the estate's second amended return in which it reported a zero value for the STN.Com stock and it does not appear from the record that the second amended Form 706 was accepted, although it does reflect the estate's original position taken on the petition.  The notice of deficiency, however, included a $2,960,657 gross-up to the estate to account for the additional gift tax payable with respect to Mr. Adell's corrected taxable gifts for 2006 reflected on the first amended return.  The estate received a separate notice of deficiency for the delinquent gift tax return and subsequent gift tax liability accrued as a result of the recharacterization.  The estate's gift tax petition is the subject of  Estate of Adell v. Commissioner, T.C. Memo. 2014-89.

**[*24]** Using this information, Mr. Risius described STN.Com as a company that generates revenue by uplinking network television broadcasting for its sole customer, The Word, pursuant to a services and facilities agreement. Mr. Risius reported that STN.Com received 95% of the revenue generated by The Word as consideration.[34] Although Mr. Risius acknowledged that STN.Com's single contract with its single customer posed significant risks, he concluded that the risk could be accounted for by adding a company risk adjustment of 3%.

Mr. Risius' financial statement analysis began with a balance sheet analysis that included consideration of STN.Com's net working capital, property and equipment, interest-bearing debt, and stockholders equity. Because STN.Com's historical working capital, which included accounts receivable and accounts payable, demonstrated an upward trend except for 2005, Mr. Risius projected that STN.Com's net working capital (current assets less current liabilities) was expected to gradually increase from approximately $1.2 million to $1.6 million, remaining constant at approximately 6.3% of sales.[35] STN.Com's overall assets,

___

[34]As noted supra pp. 11-13 and note 16, STN.Com's financial statements for its TYE 2002 through 2006, and upon which Mr. Risius relied to prepare his valuation report, also described STN.Com's consideration as 95% of the revenue generated by The Word.

[35]Mr. Risius defined the historical period as the five TYE June 30, 2002

(continued...)

**[*25]** including gross fixed assets of leasehold improvements, uplinking and broadcasting equipment, office furniture, and one or more vehicles, increased from $2.2 million in 2002 to $5.6 million in 2005 and then decreased to $4.9 million as of 2006.[36] STN.Com had approximately $854,000 of interest-bearing debt and stockholders equity that increased from approximately $559,000 to $3.8 million during the historical period.

In his income statement analysis, Mr. Risius noted that sales increased rapidly during the historical period from approximately $7.9 million in 2002 to $15.9 million in 2006 and were projected to increase from approximately $18.5 million to $26 million during the projection period. "Due to several unusual or nonrecurring expense items", however, Mr. Risius made a number of adjustments to STN.Com's reported financial results to more accurately reflect STN.Com's

---

[35](...continued)
through 2006, and the projection period as the five TYE August 13, 2007 through 2011, and the residual period ending August 13, 2012.

[36]On the basis of his conversations with management, Mr. Risius projected net capital expenditures to range from approximately $200,000 to $2 million over five years. According to management, STN.Com budgeted significant capital expenditures in the future to purchase a tour bus in 2007 and equipment upgrades in 2009. In 2006 or 2007 STN.Com purchased a bus that cost about $800,000.

[*26] normalized ongoing operating performance. Among the adjustments was a reduction in officers salaries and wages to reflect market rates.[37]

Mr. Risius also adjusted STN.Com's operating expenses to include an economic charge for Kevin's personal goodwill. Mr. Risius explained that the adjustment was appropriate because the success of STN.Com depended heavily on Kevin's personal relationships with the board of directors of The Word. Moreover, Kevin did not have a noncompete agreement with STN.Com, and as a result a potential buyer would acquire STN.Com only to the extent that the company retained Kevin. The economic charge for Kevin's personal goodwill ranged from 37.2% to 43.4% of sales over the historical period and from 43.7% to 44.1% of sales over the projection period. Mr. Risius added the economic charge to STN.Com's projected operating expenses, thereby increasing the expenses to

---

[37]Mr. Adell and Kevin's combined compensation increased from approximately $3.2 million to $8.6 million. Because Mr. Adell was the owner of STN.Com in addition to being an employee, and Kevin was his son, Mr. Risius explained that only the market rate that would be paid to a third party to perform their duties should be considered as officers salary. As adjusted, Mr. Risius estimated STN.Com's annual base market compensation for management to be $480,000. Because Mr. Risius described STN.Com's revenue as 95% of The Word's revenue without being capped at STN.Com's cost of services provided, Mr. Risius did not address whether any reduction in STN.Com compensation would mean a reduced programming fee paid by The Word.

[*27] approximately $8 million for the TYE 2007 to $11 million for the residual period ending in 2012.

STN.Com's other operating expenses, which included programming expenses, satellite fees, legal and professional fees, and other administrative expenses, increased during the historical period from approximately $2 million to $4.2 million, in line with STN.Com's overall growth. As adjusted, STN.Com's earnings before interest, taxes, depreciation and amortization generally increased over the historical period in line with overall sales and was projected to reflect 12.1% of sales, or approximately $2.2 million in the first year of the projection period to $3.1 million in the residual period.

On the basis of the foregoing, Mr. Risius determined that STN.Com was an operating entity that was expected to produce positive cashflows in the future.[38] In other words, the value of STN.Com as a going concern exceeded the value of its underlying assets in liquidation.[39] Accordingly, Mr. Risius used a discounted

---

[38]Mr. Risius explained that the highest and best use of a company is either as a going concern or in liquidation depending on which generates the higher value; and with respect to STN.Com, its highest and best use was as a going concern.

[39]The asset approach in valuing an entity may be used in the valuation of operating companies where the value of the underlying assets in liquidation--as reduced to reflect associated tax liabilities--exceeds the value of the business as a

(continued...)

[*28] cashflow analysis of the income approach when valuing the STN.Com stock.[40]

First Mr. Risius calculated the total weighted average rate of return, which he noted is the combination of the return on both debt and equity. The rate of return was based on an assumed capital structure of 30% debt and 70% equity. Mr. Risius determined that the required rate of return on equity was 26.9%, which includes a company risk adjustment of 3% to account for the risk associated with losing STN.Com's only customer, The Word. He then calculated that the estimated after-tax required rate of return on debt was 4.4% by adjusting a known pretax return on debt rate of 6.7% to reflect an effective Federal income tax rate of 34%. Mr. Risius calculated the total weighted average rate of return--around

---

[39](...continued)
going concern. See Estate of Smith v. Commissioner, T.C. Memo. 1999-368. In his first valuation report, Mr. Risius determined that the income approach, as opposed to the asset approach, was appropriate to value the STN.Com stock.

[40]The discounted cashflow method is one valuation method under the income approach, which values a company on the basis of its earning capacity. Estate of True v. Commissioner, T.C. Memo. 2001-167, aff'd, 390 F.3d 1210 (10th Cir. 2004). The estimated value of a company is based on the present value of its expected future economic benefits, i.e., its distributable cashflow. The method evaluates a company's earnings and dividend-paying capacity available to investors and may consider reinvestment required for the company's growth.

[*29] 20%--by summing the products of each portion of the capital structure with its respective rate of return.[41]

Mr. Risius applied the rounded 20% rate of return to a stream of annual net cash projected for STN.Com to calculate an enterprise value of $7.7 million. The enterprise value includes the present value of STN.Com's residual cashflow, $4,284,800, plus the present value of its cashflows for the projection period, $3,434,000. After making adjustments to the enterprise value to account for STN.Com's cash and cash equivalents, interest-bearing debt, and nonoperating assets, Mr. Risius concluded that the fair market value of the STN.Com stock on Mr. Adell's date of death was approximately $9.3 million. This valuation was included in the original estate tax return filed in November 2007.

B. Mr. Risius' October 29, 2012, Valuation Report

More than five years after his first valuation report, Mr. Risius, on behalf of Stout Risius Ross, prepared a second valuation report for the STN.Com stock which the estate submitted at trial. In the second valuation report, Mr. Risius valued the STN.Com stock using the adjusted book value method reflecting liquidation or sale of assets instead of a discounted cashflow method. He

---

[41] $0.2015 = (0.044 \times 0.30) + (0.269 \times 0.70)$

[*30] determined that the fair market value on Mr. Adell's date of death was $4.3 million.

Mr. Risius' valuation of the STN.Com stock decreased primarily because he used the asset approach instead of the income approach. Mr. Risius changed his valuation approach because of a new understanding of the services agreement. In his first valuation report, Mr. Risius did not account for the limitation imposed on STN.Com's programming fee to the lesser of its cost or 95% of The Word's revenue whereas in his second valuation report he accounted for the limitation. Mr. Risius testified that he realized his mistake when testifying for a hearing during the Oakland County probate litigation in 2009.

On the basis of his new understanding of the services agreement, Mr. Risius explained that the income approach, which requires positive cashflow to be available for distribution to shareholders, was not appropriate for valuing the STN.Com stock because the services agreement did not allow STN.Com to generate a profit.[42] According to Mr. Risius: "Although STN has generated

---

[42]In making his determination, Mr. Risius relied in part on an expert opinion prepared by Kenneth Kolmin regarding the terms of the services agreement. On November 6, 2012, respondent filed a motion in limine to exclude Mr. Kolmin's expert report from evidence and to exclude any portion of the other expert reports that relied on Mr. Kolmin's report. In an order dated December 6, 2012, the Court granted respondent's motion to the extent that it sought to exclude Mr. Kolmin's

(continued...)

[*31] profits in the historical period a hypothetical buyer of a company would not place any weight on the historical performance of the company given the terms of the agreement with * * * [The Word]."

Under the asset approach Mr. Risius accounted for STN.Com's lack of ability to generate a profit from its sole customer and the fact that STN.Com did not have any other source of revenue or other customers from which STN.Com could generate income. Accordingly, Mr. Risius valued the STN.Com stock using the adjusted book value method of the asset approach. Using the adjusted book value, Mr. Risius determined the STN.Com stock was worth $4.3 million on Mr. Adell's date of death.[43]

---

[42](...continued)
report from evidence, but it denied respondent's motion with respect to the expert reports that relies on, adopts, or references Mr. Kolmin's report. Notwithstanding the foregoing, to the extent Mr. Risius' conclusion that STN.Com lacked any legal right to earnings under the services agreement is based on Mr. Kolmin's report, he is in error. As described in Mr. Risius' first valuation report, STN.Com historically earned a profit under the terms of the services agreement and continued to do so well after Mr. Adell's death.

[43]Mr. Risius' second valuation report relied on an independent valuation report by Accuval Associates, Inc. (Accuval Associates), dated October 12, 2012, for his estimation of the Fair Market Value-Installed of STN.Com's tangible personal property assets as of August 13, 2006. The Accuval Associates report used the term "Fair Market Value-Installed".

[*32]  C.  <u>Alex W. Howard's October 29, 2012, Valuation Report</u>

The estate's second expert witness, Mr. Howard, used the net asset value method of the asset approach to value the STN.Com stock and concluded that its fair market value on Mr. Adell's date of death was $4.3 million.[44]  Like Mr. Risius, Mr. Howard was also an employee of Stout Risius Ross when he prepared his valuation report, but he did not work on his report with Mr. Risius.

In his valuation analysis, Mr. Howard concluded that the income approach was not appropriate in determining the STN.Com stock's fair market value "due to the lack of earnings that could be generated by * * * [STN.Com] under the provisions of the * * * [services agreement]."  While Mr. Howard acknowledged that STN.Com generated net income historically, he determined that a hypothetical buyer would not reasonably expect to generate profits because under the services agreement, STN.Com "should have been only reimbursed for costs incurred, effectively making it a zero profit situation."

Another reason Mr. Howard determined that the income approach was inappropriate was that STN.Com's executive compensation model restricted the

---

[44]Unlike Mr. Risius, Mr. Howard did not rely on Mr. Kolmin's expert report and testified that he did not know it existed.  Although an employee of Stout Risius Ross when he prepared his report, Mr. Howard had left Stout Risius Ross and had his own firm when he testified.

[*33] company's earning potential. Mr. Howard explained that analysts and buyers typically adjust historical and projected cashflows to account for high salaries paid to executives when determining the fair market value of a controlling interest in a company. He cited the provision of the services agreement that defined reimbursable costs to include a "reasonable allocation of salaries, wages, employee benefits, and the employer's share of payroll taxes of all employees employed by STN in providing services under the Agreement". According to the terms of the services agreement, however, "any reduction in salaries would result in a dollar for dollar reduction in revenue for * * * [STN.Com], preventing a hypothetical purchaser of the Shares from generating profits by reducing salaries to market levels." Further, Mr. Howard determined that an unrelated party would find STN.Com's executive compensation unreasonable, preventing a hypothetical purchaser from increasing earnings by increasing executive compensation. Accordingly, Mr. Howard found the income method was inappropriate because the services agreement would restrict a hypothetical buyer from increasing profits by cutting executive compensation, and the hypothetical buyer could not increase profits by giving himself a high salary because STN.Com's already unreasonable executive compensation would not be approved by a third party.

[*34]  In addition to lacking a contractual guaranty of a specific return, Mr. Howard noted that STN.Com's projected cashflow streams from its only customer, The Word, were uncertain because Kevin did not have a noncompete agreement with STN.Com and could create a new company to replace STN.Com.  He explained that the goodwill associated with the relationship between Kevin and The Word was personal to Kevin.  Without an employment agreement with Kevin, Mr. Howard concluded that an income approach was not appropriate to determine the fair market value of the STN.Com stock.

Mr. Howard determined that the net asset value method was the appropriate valuation method because STN.Com had assets with values that could be determined.[45]  Using this valuation method, Mr. Howard determined that on Mr. Adell's date of death, the fair market value of 100% of the STN.Com stock was $4.3 million.

D.  Francis X. Burns' October 31, 2012, Valuation Report

Respondent's expert witness, Mr. Burns, valued the STN.Com stock using the discounted cashflow method of the income approach and determined that the

_____

[45]Mr. Howard's valuation report relied on the independent valuation report of Accuval Associates dated October 12, 2012, for his valuation of the fair market value of STN.Com's fixed assets.

[*35] value on Mr. Adell's date of death was $26,341,030.[46]  In his valuation he reviewed STN.Com's business operations, ownership structure, and financial performance between TYE 2002 and 2006.  He also reviewed the services agreement and, like Mr. Risius and Mr. Howard, noted that the monthly program fee payable from The Word, STN.Com's only customer, to STN.Com was limited to "the lesser of actual cost or * * * [95%] of net programming revenue received by * * * [The Word] in a one month period."

On the basis of his analysis of the foregoing, Mr. Burns determined that the appropriate valuation method for the STN.Com stock on Mr. Adell's date of death in 2006 was the discounted cashflow method of the income approach.  In support of his conclusion, Mr. Burns explained that STN.Com was a fairly young company as of the valuation date that had been profitable in each of the fiscal years preceding the valuation date.  As a source for his projected cashflow assumptions, Mr. Burns used the management discussions cited in Mr. Risius' first valuation report.

Mr. Burns adopted Mr. Risius' projected sales for STN.Com for the five years plus a residual period after the valuation date which ranged from

---

[46]By contrast, respondent's valuation in the notice of deficiency was greater than $92 million.

[*36] approximately $18.5 million to $26 million during the projection period. Mr. Burns noted that the sales projections assumed that The Word would continue its practice of paying STN.Com according to its revenues rather than STN.Com's actual costs. He also adjusted officers compensation to market rates, explaining that a hypothetical investor would maximize STN.Com's cashflow by paying compensation at market rates. Mr. Burns did not, however, address whether his adjustment to officers compensation would reduce STN.Com's program fee pursuant to the terms of the services agreement.

Mr. Burns also addressed the importance of Kevin's relationship with The Word to STN.Com's continued business operations. Instead of applying an economic charge for Kevin's personal goodwill similar to the one found in Mr. Risius' first valuation report, Mr. Burns concluded that a hypothetical investor would anticipate retaining Kevin as an officer of STN.Com and would need to compensate Kevin at an acceptable rate of 8.1% of sales. Mr. Burns noted that his assumed compensation level for Kevin of nearly $1.3 million in 2006 was significantly higher than Mr. Risius' estimate of $528,000 in his first valuation report.

On the basis of STN.Com's existing level of interest-bearing debt and estimates of its equity value, Mr. Burns assumed a capital structure of 5% debt and

[*37] 95% equity and calculated a weighted average cost of capital (or discount rate) of 25.5%. Mr. Burns' discount rate was higher than the 20% used by Mr. Risius and, according to Mr. Burns, led to a lower valuation of the STN.Com stock. However, Mr. Burns applied the 25.5% discount rate to a stream of annual net cashflow that was substantially higher than the net cashflow calculated by Mr. Risius in his first report. Mr. Risius' calculation of distributable cash was substantially lower than that calculated by Mr. Burns primarily because Mr. Risius reduced STN.Com's projected sales, which were the same numbers used by Mr. Burns, by the economic charge for Kevin's personal goodwill. The result was a net present value of total invested capital of $30,689,559, which was much higher than Mr. Risius' enterprise value of approximately $7,700,000.

After making adjustments to the value of total invested capital to account for STN.Com's cash and cash equivalents, interest-bearing debt, and nonoperating assets, Mr. Burns applied a 20% discount for lack of marketability and concluded that the fair market value of the STN.Com stock on Mr. Adell's date of death was $26,341,030.

## OPINION

The Court is asked to determine the fair market value of Mr. Adell's 100% interest in STN.Com on his date of death and whether the estate is liable for the

[*38] substantial estate tax valuation understatement penalty with respect to the STN.Com stock. The parties have both substantially changed their positions reflected in the notice of deficiency, the original petition, and the answer to the Court. The estate now argues that the fair market value of the STN.Com stock it held on the valuation date was $4.3 million. Respondent now asserts that the fair market value of the stock was $26,341,030.

## I. Burden of Proof

During the trial the estate filed a motion to shift the burden of proof to respondent under section 7491(a). In an order entered on December 6, 2012, the Court found that the estate's substantially inconsistent positions regarding the valuation of the STN.Com stock demonstrated a failure to meet the requirements of section 7491(a)(2) and therefore the burden of proof remained with the estate.[47] The Court noted that notwithstanding its declining to shift the burden of proof to respondent the case will ultimately be decided on the preponderance of the evidence. In its posttrial brief the estate again argues that the burden of proof should shift to respondent with respect to the valuation of the STN.Com stock.

---

[47]The estate asserted the STN.Com stock was worth $9.3 million on its original estate tax return and on its second amended estate tax return. On the original petition filed with the Court the estate asserted the STN.Com stock had zero value. The estate's position at trial was that STN.Com stock should be valued at $4.3 million.

**[\*39]** After review of the estate's posttrial brief, the Court sustains the order denying the motion to shift the burden of proof.[48]

In general, the Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer has the burden of proving that the Commissioner's determinations are incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a) allows a taxpayer to shift the burden of proof to the Commissioner with respect to a factual issue if the taxpayer introduces credible evidence regarding that issue relevant to ascertaining the taxpayer's liability for a tax (under subtitle A or B). "'Credible evidence is * * * evidence which, after critical analysis, the court would find sufficient * * * to base a decision on the issue'" in the taxpayer's favor, absent any contrary evidence. Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H. R. Conf. Rept. No. 105-599, at 240-241, 1998-3 C.B. 747, 994-995).

The estate did not present evidence which, after critical analysis, the Court would find sufficient to base a decision on the issue on because the evidence was inconsistent. See id. Inconsistent evidence is not credible and is not persuasive to shift the burden under section 7491. See Gutierrez v. Commissioner, T.C. Memo.

_____

[48]The parties briefed a number of evidentiary objections that the Court had reserved ruling on at trial. Those objections not dealt with in this opinion have been dealt with by order dated August 4, 2014.

[*40] 2003-321. The estate presented conflicting expert reports and three different values of the STN.Com stock. The three different positions taken highlight the lack of credible evidence necessary to shift the burden. Instead of one position on which the Court could base a decision according to the standard in Higbee, the estate presented three different views that may each have some merit. Accordingly, the inconsistent evidence presented is not credible under section 7491 and the burden remains with the estate.

Further, the parties have stipulated the operative facts and documents, and specifically the terms of the services agreement between STN.Com and its only customer, The Word. The parties dispute, however, the impact of the services agreement on the valuation of the STN.Com stock as of the date of Mr. Adell's death. In these circumstances, there is no need to analyze or decide which party has the burden of proof or whether the estate met the "credible evidence" requirement. As the finder of fact, the Court considers the underlying facts agreed upon by the parties and presented at trial and looks to the experts' reports for guidance on deciding the valuation issue.

## II. Valuation of the STN.Com Stock

After concessions by the parties, the remaining issues for decision are the value of the STN.Com stock included in the gross estate and the related penalty.

[*41] The value of property is a question of fact.  Estate of Newhouse v.

Commissioner, 94 T.C. 193, 217 (1990).  During the trial, the estate asserted that

the value of the STN.Com stock was $4.3 million, and respondent asserted that the

value was $26,341,030.

### A.  Fair Market Value

The transfer of the taxable estate on Mr. Adell's death is subject to estate

tax.  Sec. 2001; Estate of Deputy v. Commissioner, T.C. Memo. 2003-176.  The

taxable estate is the gross estate less allowable deductions.  Sec. 2051.  The gross

estate includes the value of all property that Mr. Adell owned on the date of death.

Sec. 2031.  Generally, the value of the gross estate is the fair market value of the

included property as of the date of death.   Sec. 20.2031-1(b), Estate Tax Regs.

Fair market value is the price at which property would change hands

between a willing buyer and a willing seller, neither under any compulsion to buy

or sell and both having knowledge of relevant facts.  Id.  The willing buyer and

seller are hypothetical, and valuation does not take into account the personal

characteristics of the actual buyer or the actual seller.  Estate of Curry v. United

States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Noble v.

Commissioner, T.C. Memo. 2005-2.  The hypothetical willing buyer and seller are

presumed to be dedicated to achieving the maximum economic advantage, namely

**[*42]** the maximum profit from the hypothetical sale. Estate of Noble v. Commissioner, T.C. Memo. 2005-2. The determination of fair market value is a question of fact, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); see also Estate of Newhouse v. Commissioner, 94 T.C. at 217.

While listed prices of publicly traded stock are usually representative of the fair market value of that stock for Federal tax purposes, special rules apply when valuing stock of a closely held corporation. Estate of Noble v. Commissioner, T.C. Memo. 2005-2. The fair market value of stock of a closely held corporation is best determined by considering actual sales at arm's length in the normal course of business within a reasonable time before or after the valuation date. Id. If the value of the stock cannot be determined by using arm's-length sales, fair market value is generally determined by considering all relevant factors that would affect fair market value. Id. These factors include the corporation's net worth, prospective earning power, dividend-paying capacity, and other factors. Sec. 20.2031-2(f), Estate Tax Regs.; Rev. Rul. 59-60, sec. 4.01, 1959-1 C.B. at 238. These factors cannot be applied with mathematical precision, and must be considered in the light of the particular facts of each case. Estate of Andrews v.

[*43] Commissioner, 79 T.C. 938, 940-941 (1982);  Kohler v. Commissioner, T.C. Memo. 2006-152.

In the absence of arm's-length sales, the fair market value of nonpublicly traded stock is generally determined by using three approaches--market, income, and asset based.  Estate of Noble v. Commissioner, T.C. Memo. 2005-2.  The market approach values a company's nonpublicly traded stock by comparing that stock to the same or comparable stock that has sold in arm's-length transactions in the same timeframe.  Id.  The income approach values a company's nonpublicly traded stock by converting anticipated economic benefits into a single present amount.  Id.  The asset-based approach values a company's nonpublicly traded stock by looking to the company's assets net of its liabilities.  Id.

B.  Expert Opinions

Both parties submitted expert reports providing valuations of the estate's STN.Com stock as of Mr. Adell's date of death.  The expert reports used different valuation methods resulting in two proposed valuations, $4.3 million as proposed by the estate and $26,341,030 as proposed by respondent.

When considering expert testimony, the Court is not required to follow the opinion of any expert if it is contrary to the Court's judgment.  Estate of Deputy v. Commissioner, T.C. Memo. 2003-176 (citing Helvering v. Nat'l Grocery Co., 304

**[\*44]** U.S. 282, 295 (1938), and <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), <u>aff'g</u> T.C. Memo. 1974-285).  The Court may adopt or reject expert testimony in whole or in part.  <u>Estate of Davis v. Commissioner</u>, 110 T.C. 530, 538 (1998).

The Court is not obligated to pay any regard to an expert opinion that lacks credibility.  <u>Estate of Hall v. Commissioner</u>, 92 T.C. 312, 338 (1989).  The Court may find evidence of valuation provided by one of the parties to be more credible than that of the other party, rather than a compromise between the two.  <u>See</u> <u>Buffalo Tool & Die Mfg. Co. v. Commissioner</u>, 74 T.C. 441, 452 (1980).

C.  <u>The Estate's Expert Witnesses:  Jeffrey Risius and Alex Howard</u>

Before the estate submitted Mr. Risius' and Mr. Howard's expert testimony at trial, it filed its original Form 706 on November 13, 2007, with a valuation report of the estate's STN.Com stock that was prepared primarily by Mr. Risius on June 15, 2007, 10 months after Mr. Adell's death and before the probate litigation. In the valuation report Mr. Risius used the discounted cashflow analysis of the income approach to determine that the fair market value of STN.Com's stock was $9.3 million.  On the basis of Mr. Risius' valuation the estate reported that the date-of-death value of the STN.Com stock was $9.3 million.

**[\*45]** The estate now asserts that the fair market value was less than $9.3 million, relying on Mr. Risius' second valuation report and on Mr. Howard's valuation report, both of which are dated October 29, 2012. The expert reports prepared by Mr. Risius and Mr. Howard came to the same conclusion: the appropriate valuation method of the STN.Com stock on Mr. Adell's date of death was the asset approach and under that approach the fair market value of the STN.Com stock was $4.3 million. The reported value on the estate's original return, however, was an admission by the estate, and the lower value of $4.3 million cannot be substituted without cogent proof that the reported value was erroneous. See Estate of Hall v. Commissioner, 92 T.C. at 337-338.

As proof that the reported value on the estate's original return was erroneous, the estate relies on the terms of the services agreement. Specifically, the estate cites the provision in the services agreement that limits STN.Com's programming fee to the lesser of its actual cost or 95% of The Word's revenue. The estate argues that this provision prevents STN.Com from being profitable and therefore any valuation of STN.Com must be based on the liquidation of its assets, its highest and best use.[49]

---

[49]In his first and second valuation reports, Mr. Risius explained that the highest and best use of a company is on either a going concern or a liquidation

(continued...)

**[\*46]**  In his first valuation report, Mr. Risius did not mention the limitation on STN.Com's programming fee.  Rather, he described STN.Com's sales as 95% of The Word's broadcasting revenue relying on the description reflected on STN.Com's Financial Statements for the years reviewed.  In his second valuation report, however, Mr. Risius relied on the limitation to STN.Com's programming fee under the terms of the services agreement to conclude that STN.Com could not legally make a profit if the agreement with The Word was strictly construed.  Therefore, notwithstanding STN.Com's profitability during the five years preceding Mr. Adell's date of death,[50] Mr. Risius found that STN.Com's highest value was not as a going concern but as the liquidation of its assets.  Mr. Risius' second valuation report determined that the asset approach to valuation was therefore appropriate.

---

[49](...continued)
basis depending on which generates the higher value.

[50]Mr. Adell's date of death was August 13, 2006.  STN.Com's tax year ended in June and the financial statements reflected $3.8 million in shareholder equity.  STN.Com accordingly paid the Adell Trust $1,157,976, for a total compensation paid to Mr. Adell of $7,354,594 that was reported on the return for the TYE in June 2007.  The same return shows that Kevin received $1,292,758 in compensation.  In TYE June 2007 and 2008 STN.Com paid Kiven compensation of $9,734,643 and $8,204,066, respectively.  See supra p. 14.

**[*47]**  To the extent that Mr. Risius' determination that STN.Com could not legally make a profit relied on Mr. Kolmin's excluded expert report regarding the same, his determination and the conclusion drawn thereon, i.e., that STN.Com's highest value was the liquidation of its assets, is mistaken.  Even if Mr. Risius did not rely on Mr. Kolmin's excluded expert report, which is plausible since he testified that he realized his mistake at a probate hearing before Mr. Kolmin prepared his expert report, he incorrectly assumed that STN.Com was not a profitable company.

Despite the limitation of STN.Com's programming fee, STN.Com was a profitable company on the date of Mr. Adell's death and it was reasonable to conclude that it would continue to be profitable thereafter.  The profitability of STN.Com was supported by five years of STN.Com's financial statements,[51] which were prepared by Mr. Lameti's accounting firm, and by discussions with STN.Com's management during the year after Mr. Adell's date of death.  Although The Word could have enforced the limitation on STN.Com's programming fee, it did not do so for the five years preceding Mr. Adell's date of death, or the four years thereafter.  Moreover, management made no indication

---

[51]The same financial statements reported the contractual arrangement as being 95% of the revenue generated by The Word.  See supra p. 24 and note 34.

[*48] that The Word would enforce the limitation and in fact predicted that its sales would increase, resulting in expected capital expenditures that would enhance the value of STN.Com such as the purchase of an $800,000 tour bus and substantial expenditures for additional broadcasting equipment. Management's discussions during the first year after Mr. Adell's death were particularly important because management, mainly Kevin, controlled The Word and could therefore give Mr. Risius an accurate picture of STN.Com's historical and projected profitability as of the date of Mr. Adell's death.[52]

Furthermore, even if The Word decided to enforce the limitation on STN.Com's programming, the limitation did not necessarily mean that STN.Com could not be profitable. The company would continue to collect sales revenue from its contract with The Word and, with its broadcasting equipment and expertise, could potentially expand its operations to provide uplinking services for other customers.[53] In addition, if a hypothetical investor participated in management as Mr. Adell and Kevin had, STN.Com would not only be profitable

---

[52]The parties do not address, and the Court will not discuss, whether The Word's sec. 501(c)(3) exemption was at risk of revocation because of the unenforced contractual limitation, or the potential issue of private inurement; both topics are outside the scope of the estate's notice of deficiency.

[53]In fact, STN Satellite, STN.Com's predecessor, provided uplinking services to other companies.

[*49] but would also be valuable, as evidenced by the compensation paid to management and the provision of other benefits such as luxury cars. The biggest risk to profitability and STN.Com's value was The Word's ability to choose a different uplink provider for any reason, thereby terminating STN.Com's contract with its only customer. This risk, however, did not make STN.Com unprofitable and could be accounted for by applying a company risk adjustment.[54]

The Court therefore finds that a hypothetical willing seller and a hypothetical willing buyer could not ignore the historical performance of STN.Com's profits on Mr. Adell's date of death, and notwithstanding the programming fee limitation, STN.Com was indeed a profitable company. Thus, an income approach is the most appropriate method to determine the value of the STN.Com stock because the business' best value is as a going concern. See Smith v. Commissioner, T.C. Memo. 1999-368; Rev. Rul. 59-60, supra. In his first valuation report, Mr. Risius correctly assumed STN.Com was profitable and therefore correctly applied the discounted cashflow method of the income

---

[54]Mr. Risius, for example, applied a company risk adjustment of 3% in his first valuation report. In addition, Kevin testified that many ministers who currently purchase programming had inquired as to purchasing The Word. It is not a great leap of faith to conclude they could merely purchase STN.Com (and its uplinking license) and broadcast themselves and skip the middleman's programming fees, especially since the urban religious program broadcasters were typically nonprofit churches already.

[*50] approach to value STN.Com. Accordingly, the Court finds that Mr. Risius'
second valuation report and Mr. Howard's valuation report, both of which use the
asset approach to value the STN.Com stock are not creditable to determine the
total value of STN.Com.

D. Respondent's Expert Witness: Francis Burns

Respondent's expert witness, Mr. Burns, used the same discounted cashflow
analysis of the income approach that Mr. Risius used to value the STN.Com stock
in his first valuation. In addition, Mr. Burns substantially relied on Mr. Risius'
determinations in his first valuation report, including his projected sales for
STN.Com, which were based on the company's historical performance and on
conversations with management during the first year after Mr. Adell's date of
death. Mr. Burns, however, determined that the date-of-death value of the
STN.Com stock was $26,341,030, whereas Mr. Risius determined that its date-of-
death value was $9.3 million.

The most significant difference between Mr. Risius' first valuation report
and Mr. Burns' valuation report is their treatment of the intangible value that
Kevin provided STN.Com. While both Mr. Risius and Mr. Burns recognized that
the success of STN.Com depended on Kevin's relationships with The Word and its
customers, they accounted for that value differently. In his first report Mr. Risius

[*51] applied an economic charge for Kevin's personal goodwill that ranged from $8 million to $12 million over the projection period, thereby increasing STN.Com's projected operating expenses and decreasing its net cashflow. Mr. Burns, however, determined that a hypothetical willing investor would be able to retain Kevin for an acceptable salary, which he determined to be 8.1% of sales, or approximately $1.3 million in 2006. Mr. Burns' approach resulted in a higher estimate of STN.Com's projected net cashflow, and thus a higher valuation of the STN.Com stock.

Goodwill is often defined as the expectation of continued patronage by existing customers. Network Morning Ledger Co. v. United States, 507 U.S. 546, 572-573 (1993). A key employee may personally create and own goodwill independent of the corporate employer by developing client relationships. Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 207-208 (1998). The corporation may benefit from using the personally developed goodwill while the key employee works for the entity, but the corporation does not own the goodwill and therefore it is not considered a corporate asset. Id. at 208. The employee may, however, transfer any personal goodwill to the employer through a covenant not to compete or other agreement that transfers the relationships to the employer. See id. at 207; H&M, Inc. v. Commissioner, T.C. Memo. 2012-290. Absent such an agreement,

**[\*52]** the employer cannot freely use the asset and the value of the goodwill should not be attributed to the corporation.

Kevin's goodwill was personally owned independent of STN.Com. STN.Com's success was heavily dependent on The Word because of their symbiotic relationship. To launch The Word, it was Kevin who contacted religious leaders in the Detroit area and Rev. Jackson in Chicago. Along with his notable contacts and his father, he went to Los Angeles to meet with DirecTV representatives about broadcasting The Word. His meeting was successful and it eventually led to the national broadcasting of The Word on cable television. Kevin was the face of the operation because he was the individual soliciting content and pursuing broadcast opportunities.

Kevin's personal goodwill was further displayed when ministers chose to contribute to The Word after learning that The Word was a nonprofit organization. When contributing ministers asked about ownership opportunities, Kevin responded that The Word was a nonprofit organization and could not be sold. It appeared to the contributing ministers that there was not a corporation employing Kevin. The ministers conducted business with Kevin because they trusted him personally, not because he was a representative or employee of STN.Com. In other words, STN.Com could not own Kevin's goodwill because the customers did

[*53] not readily realize that Kevin actually worked for STN.Com. Thus, he cultivated personal goodwill with these professionals and he independently owned the asset of personal goodwill, not STN.Com.

Although Mr. Adell was a board member and officer of both STN.Com and The Word, Kevin operated both companies. Kevin had the education and background to perform uplinking broadcast services. After graduating with a communications degree, he built Mr. Adell's first television station, WADL, and on account of his experience with WADL became interested in the uplinking business. Using STN.Com's predecessor, STN Satellite, Kevin learned about the uplinking business by providing uplink services to various customers, including Hughes Electronics Corp., a major customer brought on by Kevin. Kevin, who continued to explore business opportunities that would capitalize on his background, decided to combine his success with religious programming on WADL with his uplinking services from STN Satellite by creating The Word and its uplink service provider, STN.Com.

Further, Kevin did not transfer his goodwill to STN.Com through a covenant not to compete or other agreement. Kevin was free to leave STN.Com and use his relationships to directly compete against his previous employer. If Kevin quit, STN.Com could not exclusively use the relationships that Kevin

**[\*54]** cultivated; thus, the value of those relationships should not be attributed to STN.Com.

Accordingly, Mr. Risius properly adjusted STN.Com's operating expenses to include an economic charge of $8 million to $12 million for Kevin's personal goodwill at an amount high enough to account for the significant value of Kevin's relationships. See Derby v. Commissioner, T.C. Memo. 2008-45. Mr. Burns, on the other hand, not only failed to apply an economic charge for Kevin's personal goodwill but also gave too low an estimate of acceptable compensation for Kevin, i.e., $1.3 million in 2006. This was especially so because Kevin had stepped into the position of Mr. Adell, who had previously made between over $2 million and $7 million of compensation in each of the five years before his death.

III. Valuation of the Estate's STN.Com Stock

As stated above, the Court gives no weight to the expert valuations that the estate submitted at trial, except for the consistent treatment of the underlying value of STN.Com's assets. The Court also finds that respondent's expert valuation is not persuasive because it did not reasonably account for Kevin's personal goodwill.

The Court therefore finds that the estate failed to introduce any evidence or present any arguments to persuade the Court that the value reported on its original

[*55] tax return was incorrect. Thus, the Court concludes that Mr. Risius' first valuation report on the STN.Com stock included with the original estate tax return was the most creditable because it properly accounted for Kevin's personal goodwill and appropriately used the discounted cashflow analysis of the income approach to value the STN.Com stock.

Accordingly, on the basis of the Court's review of all of the valuation evidence, giving due regard to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, the Court concludes that the fair market value of the STN.Com stock owned by the estate on August 13, 2006, was $9.3 million.

IV. Substantial Estate Tax Valuation Understatement Penalty

The Court has found that the value of the STN.Com stock held by the estate is the value the estate reported on its original Form 706. Therefore, the Court need not address whether the estate is liable for the substantial estate tax valuation understatement penalty under section 6662(g) or (h) for the STN.Com stock. An accuracy-related penalty under section 6662 may still be applicable to other items found in the stipulation of settled issues and from parties' concessions. Further, section 6662(c) is inapplicable because there was not an underpayment of tax shown on the original Form 706 from the STN.Com stock. The accuracy-related

**[\*56]** penalty under section 6662 for substantial estate tax valuation understatements of the balance of the notice of deficiency will be calculated separately on all items found in the stipulation of settled issues and from the parties concessions.

The Court has considered the parties' arguments and, to the extent not addressed herein, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.